## THE ATLANTA.

### GIANNELIS et al. v. THE ATLANTA.

### CARAVAN SHIPPING CORPORATION v. THE ATLANTA.

### CORINTHIAN S. S. CO., S. A., v. CARAVAN SHIPPING CORPORATION.

### COOK v. THE ATLANTA.

Nos. 505, 506, 507.

United States District Court
S. D. Georgia, Savannah Division.

Aug. 27, 1948.

The following is the report of Alex A. Lawrence, Special Commissioner in Admiralty:

These cases, after consolidation by order of Judge SCARLETT, were referred to the undersigned as Special Commissioner in Admiralty for the purpose of determining the amount and validity of the various claims against the fund arising from the sale of the Steamship "Atlanta" and their respective priorities.

The Commissioner now desires to report to the Court with respect to his findings of fact and conclusions of law concerning the various libels, cross-libels, interventions and claims which have been filed in this case.

"Thick as the autumnal leaves that strew the brooks of Vallambrosa" are these claims. They run a long way down the scale of the categories of possible maritime liens against a vessel. The ill-fated cruise out of which these variegated claims arose carried the "Atlanta" into the storied Spanish Main—the waters where Drake and the English seadogs preyed on the golden commerce of Castile. But there romance ends. Instead of cargoes of bullion and the riches of the Incas, we are dealing with a shipment of iron pipe. No fabulous spoils of free-booting brought wealth to the "Atlanta" crew. Rather, the Commissioner has been confronted with the un-picaresque subject of the claim of the seamen of the "Atlanta" for wages during the voyage (including overtime)—against

which there was a paltry credit of 1000 Bolivars, approximately $298.50 in the coin of our realm. The long delays which befell her Greek crew during the "Atlanta's" Carribean Odyssey were not the result of any tarrying on the pleasant isles of the Lotus-eaters or surrender to Circean charms. Such humdrum factors as delay in obtaining fuel oil at Santa Marta because of the insistence of Colombia Railway that payment be in funds of that country kept the "Atlanta" at that port for several days while the vessel was forced to tie up for more than three weeks at Curacao Island on account of lack of ready cash and sailing orders.

Briefly summarized and without any suggestion as to priority by the order of listing, the claims against the "Atlanta" are as follows:

### 1. Crew's Wages.

The libel of one Ioannis Giannelis and eighteen other members of the crew for wages, overtime, transportation, penalties, etc. from January 1, 1948, to March 30, 1948, in the total amount of $14,518.03.

The imperious rank given to seamen's wages ("which, according to the favorite saying of Lord Stowell and of Mr. Justice Story, are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages." The John G. Stevens, 170 U.S. 113, 18 S.Ct. 544, 547, 42 L.Ed. 969) was recognized from the beginning by all concerned. During the course of the trial it was stipulated that the total amount of compensation due the crew was $9900. The Commissioner was requested by all concerned to make a finding, permitting payment instanter of that amount from the funds arising from the sale of the "Atlanta." On June 3, 1948, the Commissioner approved this stipulation and made findings of fact and conclusions of law. With approval of the Court, the amounts agreed to be due were paid to the members of the crew under an interlocutory decree.

### 2. Master's Wages.

The claim of Demetrios Pantazopoulos in the amount of $1438.00 for unpaid wages as Master of the "Atlanta."·

### 3. Advances by Caravan Shipping Corporation As Charterer.

The claim of Caravan Shipping Corporation as charterer of the "Atlanta" for advances for various sums disbursed for repairs, ship stores, etc.,· in the total amount, according to the amended libel, of $8585.72.

### 4. Tort Claim by Owner of Lighter.

Claim of Oceanic Ship Scaling and Painting Company, Inc., for $2321.79 arising by reason of the unauthorized use of its lighter by the crew of the "Atlanta," causing its loss through overloading same with drums of oil.

### 5. Fine by Immigration Service.

Claim of United States of America against the "Atlanta" for penalty and fine totalling $1,190 in connection with failure of owners to furnish a list of alien members of the crew and failing to detain on board in port a certain alien seaman. 8 U.S.C.A. §§ 171 and 167.

After the filing of the intervention of the United States to protect the claim for penalties and after the sale of the vessel at public outcry, the Collector of Customs denied to the new owners clearance papers from the Port of Savannah, a procedure sanctioned by The City of Athens, D.C., 73 F.Supp. 362. Subsequently the federal authorities remitted the fine to $390. By agreement that amount was unconditionally allocated from the funds on hand in full settlement of the Government's claim.

### 6. Services of Marine Surveyor.

R. M. Cook, Marine Surveyor of Savannah, claims $750 for services in connection with the conversion of the "Atlanta" from a buoy tender to a cargo ship.

### 7. Wharfage.

The Atlantic Coast Line Railroad Company intervened in connection with certain dock charges at Savannah at the rate of $25 per day from March 27, 1948, to the date of the sale of the ship by the Marshal. This claim which (with the exception of three days) is in the nature of Marshal's costs has been paid and the intervention dismissed. Intervenor conceded that there was no maritime lien for the 3 days wharfage charge incurred immediately prior to

the seizure of the "Atlanta" by the Marshal. See The C. Vanderbilt, D.C., 86 F. 785.

8. *Mortgage of Kolgaklis et al. on Vessel.*

Claim of Theodore A. Kolgaklis, James C. Nash and Alexander Vergas under a mortgage dated November 29, 1947, executed by Corinthian Steamship Company, S. A. as owner of the "Atlanta," encumbering the vessel to secure an indebtedness of $20,000 for converting and equipping the vessel.

9. *Mortgage of James C. Nash on Vessel.*

Claim of James C. Nash under a mortgage on the "Atlanta" dated March 29, 1948, securing an indebtedness of $10,000 and evidenced by two promissory notes of Corinthian Steamship Company.

10. *Broker's Commissions.*

The intervention of John Georgaros of New York City claims a lien against the proceeds of the sale of the "Atlanta" in the sum of $3976.85 representing commissions allegedly due him under a written contract from Corinthian Steamship Company, S. A., dated December 29, 1947, authorizing the offering of the vessel for time charter.

Resumé of Facts

Voluminous evidence was taken before the Special Commissioner in connection with these claims. Hearings were held on at least six separate days. Numerous briefs and replies have been presented, evidencing considerable industry and ability.

The facts will be more precisely developed in the course of this report as they happen to relate to each claim under consideration. However, for a better understanding of the many legal and factual issues involved it will be well to sketch at the inception the broad outlines and background of the case.

The "Atlanta," a vessel of 250 net tons, had formerly been a buoy tender in the service of the United States Coast Guard. In December, 1946, she was purchased by the Corinthian Steamship Company S. A., a corporation of Panama.

During 1947 the "Atlanta" was converted at Savannah to cargo service. Subsequently the stock of the corporation was acquired by certain citizens of Greece. On October 4, 1947, fifteen prospective members of the crew signed a contract at Piraeus to go to America for the purpose of embarking on various voyages on the "Atlanta" and proceeded to Mobile to join the vessel. On December 29, 1947, John Nasios, an American citizen, who was a brother of E. Nasios of Greece, one of the stockholders, entered into a contract with John Georgaros, a New York broker, to offer the vessel on time charter. Three days later a time charter was executed on behalf of Corinthian Steamship Company by Mr. Georgaros. Under it the vessel was to be placed at the disposal of Caravan Shipping Corporation, of New York, at Tampico, Mexico, for a period of two months (with an option of another month) at a charter rental of $9500 per month. The owners of the vessel guaranteed that she would lift 550 gross tons of 4 to 12 inch steel or iron pipe not exceeding 18 feet in length. The vessel was represented as being "capable of steaming, fully laden, under good weather conditions at about 10 knots on a consumption of about 10 tons of best grade fuel oil."

The "Atlanta," under Panamanian registry and flag, sailed from Mobile on January 6, 1948. She arrived on January 10th at Tampico where she was loaded with a cargo of iron pipe. The proper method of loading such pipe is sharply in dispute. At any rate, as loaded, the capacity of the vessel fell short of the guaranty of 550 tons to the extent of 70.88 long tons. Enroute to Puerto Cabello, Venezuela, her destination, she was delayed by strong northeast winds and heavy seas. On account of a shortage of fuel oil she was forced to put in at Santa Marta, Colombia and did not arrive at Puerto Cabello until February 8th, some 23 days after leaving Tampico. The ordinary running time would have been 9 days.

On February 8, 1948, the day of her arrival at Puerto Cabello, the time charter

was drastically modified by a so-called Addendum which Georgaros executed at New York on behalf of the owners. His right to do so under his agency has been strenuously challenged by Corinthian Steamship Company. In the Addendum the owners, through Georgaros, conceded the failure of the vessel to measure up to the specifications of the charter as to lifting capacity, speed, and fuel oil consumption. The new agreement provided that the hire of the vessel on a time basis was to cease with the discharge of the cargo at Puerto Cabello. In lieu of the former undertaking Caravan agreed to pay charter hire for a voyage from Tampico to Puerto Cabello and back to an agreed port in the Gulf of Mexico, on the basis of the speed and consumption of fuel oil indicated in the charter party and an estimated mileage basis "without reference to the actual time consumed and fuel oil used."

After 3 days in dry dock at Curacao Island the vessel lay by for 24 days, awaiting orders. No funds for her operation had been forthcoming from the owners since she left Mobile. Ordinary disbursements for the ship had been advanced by Caravan. After leaving Curacao Island the "Atlanta" refueled at Puerto Cabello and then went to Havana. From thence she came to Savannah where the crew and other parties commenced the libel proceedings which are now under consideration.

The "Atlanta" was subsequently sold at public outcry by the United States Marshal, being knocked down for $27,000. The successful bidder failed to comply with the cash terms of the sale. Upon a report to the Court (which meanwhile had confirmed the sale) a contempt rule was issued against him to show cause why he should not be adjudged in contempt and fined the amount of the bid; why he should not be committed until the payment thereof and why an execution against his property should not be issued. Cf. Camden v. Mayhew, 129 U.S. 73, 9 S.Ct. 246, 32 L.Ed. 608; Feldman v. American Palestine Line, 2 Cir., 18 F.2d 749. The purchaser later purged himself of the contempt by payment of the full amount of his bid into the registry of the Court.

Claim of Caravan as Charterer for Advances, etc.

Cross-Libel of Corinthian as Owner.

The focal point of conflict in the litigation centers about the libel of Caravan Shipping Corporation as charterer of the "Atlanta" and Corinthian's cross-libel as owner. An amendment filed by Caravan alleges that the balance due it for cash advances, dry-docking costs, etc., is $8,585.72. During the course of the trial the elimination of certain items reduced this amount to $7696.03.

Corinthian Steamship Company claims, on the other hand, that, rather than being indebted to Caravan, the charterer is indebted to it in the amount of $16,884.15. This figure represents the charter hire from January 10, to March 31, 1948, when the ship was libelled, a total of $25,650, against which admitted credits to the charterer by way of cash advances and sums paid on account of charter hire are conceded to the extent of $9033.63, leaving a balance of $16,884.15 allegedly due Corinthian.

In this dispute two questions imperiously demand solution. They are:

(1) Was there a breach of the warranties (or representations) made in the time charter respecting the capacity of the ship and as to her approximate speed and fuel consumption?

(2) Was Georgaros as agent for Corinthian Steamship Company authorized to enter into the "Addendum" of February 8, 1948, whereby the charter was terminated upon the unloading of the "Atlanta's" cargo at Puerto Cabello and in lieu of the original basis of hire a new rate entered into based on the estimated mileage of a hypothetical cruise in accordance with the actual capacity, speed and fuel consumption of the ship? Collaterally, there is the question of ratification of the "Addendum" by Corinthian.

With commendable industry and purpose undeterred, meriting praise even where it does not win concurrence, proctor for the owner contends that Corinthian did not breach the charter specifications as to the "Atlanta's" capacity, speed, etc., and that Mr. Georgaros was without authority to

enter into the "Addendum" terminating the charter and providing for hire on a revised basis. The Commissioner confesses that the questions of fact and law involved here have been most difficult to resolve.

For a proper background to these questions it will be well to review the transactions and the events connected with the "Atlanta" in their chronological sequence. I do so below:

December 9, 1947—Georgaros, a New York ship broker, given exclusive rights to act as agent for Corinthian Steamship Company regarding the "Atlanta" in the solicitation of cargoes and the sale of the vessel.

December 29—New agency agreement between Georgaros and Corinthian Steamship Company executed by John Nasios on behalf of the latter. Under this contract the former agent was given "exclusive and complete authority to act as agent of the owner" regarding the steamship "Atlanta" in which capacity he was to solicit and contract to carry cargo, offer the vessel for time charter, negotiate the sale of the vessel, etc.

December 30, 1947—Time charter entered into between Corinthian Steamship Company through Mr. Georgaros as agent and Caravan Shipping Corporation of New York through H. C. Barnes, Vice President, in connection with the "Atlanta." For a consideration of $9500 per month the vessel was chartered to Caravan for a period of two months with an option of renewal of one month. The charter party contained the statement that the vessel was "capable of steaming, fully laden, under good weather conditions, about 10 knots on a consumption of about 10 tons of best grade fuel oil." The "Atlanta" was to be placed at the disposal of the charterers at Tampico, Mexico. The contract further provided that the "owners guarantee vessel to lift 550 gross tons of 4 to 12 inch mixed standard steel or iron pipe in lengths not exceeding 18 feet." The evidence showed that the "Atlanta" had been proposed to Caravan by a Mr. Carolin who knew that it had several cargoes of pipe moving from Tampico to Venezuela. Georgaros furnished Mr. Barnes with the general specifications of the ship which he had obtained from the owners.

January 6—"Atlanta" left Mobile after certain advances by Caravan had enabled her to depart.

January 10—vessel arrived about noon at Tampico, approximately a day late, according to the ordinary travel time to that port from Mobile. John Nasios, owner's representative and second officer, telephoned Georgaros that delay could not be helped, "that the vessel was dirty, that her pipes had to be cleaned out, fuel lines." (Deposition of Georgaros, p. 14.)

January 16—"Atlanta" departed from Tampico loaded with 479.12 long tons of iron pipe. Enroute to Puerto Cabello the vessel encountered very bad weather from the first night out delaying her considerably. According to Captain Pantazopoulos (Tr. of Evidence, p. 36-37) the boat was slowed down by northeast winds to 100 knots a day.

January 21—Georgaros writes to John Nasios aboard the "Atlanta":

"The way the ship is now is no good at all. If we do not make up the lost tonnage and speed, we will have to reduce the rates. I suggest very strongly that while the ship is in drydock in Venezuela, that you do a good job on her."

About the same period Georgaros cabled John Nasios:

"Suggest you also make aft hatches larger as lost tonnage and speed must be made up or rates will have to be reduced."

January 29—Because of lack of fuel oil the "Atlanta" put into Santa Marta, Colombia, departing on February 5th.

February 8—"Atlanta" arrived at Puerto Cabello and began discharging the cargo which was completed around the 13th or 14th of February.

February 8—After several conferences, an "Addendum" to charter party between Corinthian and Caravan was executed on behalf of each party by Mr. Georgaros and Mr. Barnes respectively. It provided:

"It is hereby understood and agreed between the owners of the steamship Atlanta and the Time Charterers that inasmuch as this vessel has failed to perform in ac-

cordance with the terms of the Charter Party insofar as her capacity to lift cargo is concerned and insofar as her speed and fuel oil consumption is concerned, that the hire of the vessel on a time basis to the Caravan Shipping Corporation is to cease upon the vessel's arrival at Puerto Cabello and finishing of her discharge of cargo destined for that port.

"The Time Charterers agree to pay total charter hire for a length of time for a voyage from Tampico, Mexico to Puerto Cabello, Venezuela and return to an agreed port in the Gulf of Mexico plus the time actually used in loading at Tampico and discharging at Puerto Cabello and for the estimated amount of required fuel oil; such time and fuel oil to be calculated on the basis of the speed and consumption of fuel oil as indicated in the Charter Party for the mileage involved for this stipulated voyage, as per H.O.Office # 117 distance tables without reference to the actual time consumed and fuel oil used.

"Caravan Shipping Corporation has agreed to the advancing of certain funds in excess of the calculated amount due the vessel under the terms of this agreement to enable the vessel to effect certain repairs, purchase certain stores and advance certain funds to crew members for account of wages, which advances in excess of the amount due under this agreement shall be construed as a direct lien against the vessel.

"It is further understood and agreed that if the performance of this vessel after the anticipated drydocking and repairs is equivalent to the original representation in the Charter Party insofar as speed, consumption and cargo capacity are concerned, that Caravan Shipping Corporation is to have the option of effecting a new Charter Party for a similar period of the original and at the same rate of hire should they have cargo or cargoes available for a vessel of this type at that time."

February 10—Georgaros cables Nasseof, one of the stockholders in Athens, Greece, and John Nasios, owner's representative on the vessel, as follows:

"Charterers dropping charter Willing to pay until day of discharge at adjusted rate after which ship will proceed to Aruba Venezuela for drydocking with drydocking advanced and guaranteed by charterers after which we shall owe drydocking costs and fuel balance to charterers with their option to recharter vessel on original basis Cable advice."

February 12—Nasseof cables Georgaros:

"Refuse cancel charter Accept only drydocking ships debit Consult lawyer Notify John not discharge unless balance charter guaranteed."

On the same day Georgaros cables Nasseof:

"We guaranteed ship ten knots on ten tons fuel and capacity minimum 550 tons However ship did six knots on fifteen tons and capacity is 480 tons Dont worry charterers will cooperate only trouble they cannot use ship for pipe contract."

On February 12th Nasseof cables Georgaros twice as follows:

"I received your telegram. You did very bad not to receive money in advance. Now they have us in their hands. Damages very big. Supposed to have money for the crew, at least 500 American dollars. For the boat now because they have us in that position, do what you please, the best. Wire me whatever money you have and if you think I ought to hold the cargo so we can receive our money for the ship. Wire response because you did not receive the freight. Wire me what to do with the cargo and what you are going to do because you ought to fix your mistake."

"I am afraid soon as we unload cargo they will walk out. Get money at once. Unless you take responsibility I am afraid greater losses. Explain adjusted rate telegraph."

February 14—Georgaros cables Nasseof as follows:

"John Dao ship agency Puerto Cabello Stop Estimated trip Tampico to Venezuela to Mobile 3680 miles should cost charterers 10600 dollars stop on this basis charterers agree to pay 6600 dollars net as full payment charter hire stop Curacao drydocking arranged 20th after which charterers desire rehire on delivery 27th Cristobal Panama providing ship guarantees carry 500

tons mahogany logs to Charleston advise immediately if acceptable stop consider same very fair lawyers agree stop cabled same to John stop suggest you apply Nash for rebate we owe him ten thousand."

February 14—Nasseof cables Georgaros:

"Speed consumption is about and depends upon sea weather capacity depends upon merchandise stop if they cooperate why seek drop contract accept change merchandise drydock ship but wish continue contract cable Johns address."

February 14—Georgaros cables Nasios:

"Letter received; estimated trip Tampico to Venezuela to Mobile 3680 miles should cost charterers $10,600 yet actual cost to date $8,000.00; on this basis charterers agree to pay $6,600.00 net as full payment charter hire Curacao drydocking arranged 20th. After which charterers desire rehire on delivery 27th Cristobal Panama providing ship guarantees carry 500 tons mahogany logs to Charleston; advise immediately if logs acceptable; paid Nash nothing; cabled same to Steve."

February 16—Nasseof cables Georgaros as follows:

"Cannot decide before learning facts and communicating with John Stop Too stupid for John sign such contracts and too clever charterers propose same Stop Ships arent chartered according mahogany logs or pipes but according cubic feet stop on new contracts decrease speed about 8-9 and increase fuel about 11-12 next time dont charter before I agree on terms stop every month must be prepaid."

February 16—Georgaros cables Nasios:

"If speed 9.1 knots trip Tampico to Venezuela back to Mobile takes 29 days charterers should pay $7,733.00 net plus $3,853.00 fuel at 11 tons less $966.00 less 70 tons total $10,620.00; so far charterers spent $8,005.-00; if you received $1,200.00 and we received $2,800.00 they owe us $2,615.00 more for return to Mobile or $6,615.00 altogether for hire; take ship to Curacao dry dock and advise if forward boom lifts 7 tons and can ship handle logs if necessary to put 400 tons forward hatch; if OK will notify you price."

February 17—Left Puerto Cabello.

February 17—Georgaros writes Nasseof in connection with the "Atlanta" as follows:

"Report # 2—S/S Atlanta

"Evidently you have not been informed as to the status of this vessel. She is in very poor condition. According to the specifications given by John Nasios (which were given to him by Mr. Nash), the vessel was capable of doing 12 knots on 10 tons of fuel, could carry 650 tons of 4" to 12" standard size pipe according to her cubic capacity, had a fore hatch of 11' x 8' and an aft hatch of 8' x 6', and had adequate loading gear.

On the above basis we guaranteed that the vessel could carry 550 tons while doing approx. 10 knots on approx. 10 tons of fuel per day. Actually the vessel, even unloaded, did an average of 6 knots between Mobile & Tampico, and then could only load 484 tons due principally to the size of the aft hatch which was only 6' x 7'. The aft boom is also useless.

Mr. Nassios, if we took the matter into court, the decision would definitely be in favor of the charterers. They would probably end up with the trip figured on the average 6 knots logged from Mobile to Tampico less the 66 tons loss in cargo that we guaranteed to carry. In that case we would end up with about $5000. for the entire trip.

"We have discussed the matter with the charterers and they have agreed to settle as follows:

"(1) Assuming that they do not desire to keep the vessel they will have to return the vessel at a Gulf Port.

"(2) If the vessel therefore was used for only one trip, the voyage would be Tampico to Puerto Cabello to Mobile or a distance of 3680 Miles.

"(3) At our guaranteed minimum speed of 9.1 knots the trip would take 17 steaming days.

"(4) Loading & unloading would take 6 days each or a total 12 days.

"(5) 17 days fuel (steaming) at a maximum consumption of 11 tons per day would equal 187 tons @ $2.30 average per barrel would amount to $2,838.66.

"(6) 12 days fuel (port) at 4 tons per day equals 48 tons @ $2.30 per barrel would amount to $728.64.

"(7) The total 29 days allowed for the voyage would at $8,000. Net to the Charterers cost $7733.33 for Charter Hire.

"(8) The loss in tonnage guaranteed was 64 tons or $899.88 which is 64/550ths. of $7733.33 is deductable.

"(9) Therefore:

| | |
|---|---|
| Net cost to Charterers | $7733.33 |
| 64/550ths. Freight Loss | 899.88 |
| | $6833.45 |
| 17 DAYS FUEL (Steam-ing) | 2838.66 |
| 12 DAYS FUEL (Port) | 728.64 |
| | $10400.75 should |

have been the total cost of Charter Hire & Fuel from Tampico to Puerto Cabello and back to Mobile.

"(10) Approximate actual costs were as follows:

| | |
|---|---|
| Georgaros | $2800.00 |
| Tampico | 400.00 |
| Santa Marta, Venezuela | 200.00 |
| Advances Puerto Cabello | 600.00 |
| Fuel | 4005.00 |
| Total | $8005.00 |

"(11) Therefore;

| | |
|---|---|
| Agreed Cost | |
| Actual Cost | 8005.00 |
| | 2395.75 |
| Tampico overtime | 208.25 |
| | $26.04.00 is the |

amount the charterers are willing to pay in full settlement, based upon the figures at hand.

"(13)

| | | |
|---|---|---|
| From the | $2604.00 | |
| plus | 4000.00 | cash advances |
| Totalling | 6604.00 | we will owe 5% of $6395.75, which amounts |
| to | 369.79 | to V. M. Carolin as a broker, leaving a |
| balance of | 6234.21 | to which is |
| added | 250.47 | received from Strachan of Mobile makes a |
| Net Balance | $6484.68 | less communications expenditures. |

"(14) Charterers further agree that upon drydocking and redelivery in Cristobal, Panama they will rehire the vessel providing that the speed is guaranteed and that the vessel guarantees to load and carry 500 tons of mahogany logs, and that the vessels insurance covers the crew and has both to blame clauses for the trip to Charleston.

"(15) The foregoing is based on the figures on hand and will be confirmed when the master of the vessel reports the exact amounts advanced to him, and when the exact financial statements are given to the charterers by their agents.

"Whereas your vessel is not in the condition expected at the time of purchase, we feel that you have just cause to seek an adjustment in purchase price. We have been instructed by John Nassios to pay Mr. Nash a $10,000. balance due them. In your best interests we shall not make any such part or whole payments unless instructed by you to do so."

February 18—Arrived Curacao where ship was drydocked and bottom scraped at a cost of $3694.60 which was advanced by Caravan.

February 18—Nasseof cables Georgaros as follows:

"Charterers know now ship better than I Why ask my guarantee to find excuse again for reduction on charter? Insurance covers Charleston."

February 20—Georgaros cables Nasseof as follows:

"Atlanta on own time ready Curacao awaiting orders stop received Nash lawyers letter demanding payment six thousand mortgage before March phoned Nash he said due March twenty ninth advise."

February 21—Georgaros cables Nasseof:

"Sugar contract available five trips 600 tons each Cuba to New Orleans berth terms very small profit sugar but get full value any return cargos advise before Monday if acceptable should make three trips per month stop cable consent to settle for six thousand total original charter cabled same to John."

February 21—Georgaros cables Nasios at Curacao:

"You appointed me agent; now you worry and give crazy instructions; cannot assume responsibility without free hand; cable consent to settle for six thousand total; sugar contract available five trips six hundred tons each Cuba to New Orleans; berth terms; very small profit sugar but get full value any return cargoes; advise before Monday if acceptable; should make three trips per month; have cabled Steve same."

February 22—Nasseof cables Georgaros:

"From whom ship awaiting orders and how arranged matters? Nash had promised 10½ miles notify John arrange matters with him."

February 25—Nasseof cables to Georgaros stating:

"Prefer New Orleans without obligation three trips stop whoever heard such obligation against any weather? Cuba Tangiers old offer 22 dollars stop cable exact distance Cuba Orleans."

March 1—Nasseof writes of Georgaros as follows:

"(2) Ship: It seems to me that many mistakes were made from ship's part. The charterers seem to be very smart. I use the word 'smart' not to use another one.

"When there is a dispute between a charterer and a ship, first of all the ship doesn't unload the merchandise before the matter is somehow settled and even when the merchandise is unloaded is done under certain conditions well known to any one who has the slightest idea about ships.

"Now why the ship should stay in Curacao waiting for a contract? So far as the charterers are obliged to redeliver her at a U. S. Port I have the opinion that you should ask them to do it at once."

March 14—Departed from Curacao and arrived the following day at Puerto Cabello where refueled.

March 17—Left Puerto Cabello.

March 21—Arrived Havana.

March 27—"Atlanta" arrived at Savannah where ship was libelled.

### Breach of Warranties

#### (1) *Capacity of Ship*

The "Atlanta" was chartered for the purpose of moving steel pipe out of Tampico where Caravan had more than 2,000 tons which it desired to transport to Venezuela. Capacity of the vessel was important to the charterer. The charter provided: "Owners guarantee vessel to carry 550 gross tons of 4 to 12 inch mixed standard steel or iron pipe in lengths not exceeding 18 feet." Proctor for Corinthian has suggested that this was a most unusual provision. Nasios, the owner's representative, testified that he was not acquainted with the fact that it had been inserted in the charter, in fact had objected to its inclusion in the first instance. (Tr. of Evidence, p. 118.) However, we are not concerned with whether or not Georgaros made a bad bargain for his principal. The time charter which he signed for Corinthian is binding on the owner in all its terms and conditions, however onerous. It guaranteed a definite capacity. This provision constituted an express warranty. Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780(4). A breach thereof permits the charterer to sue for damages. Wood v. Sewall's Adm'rs, D.C., 128 F. 141, affirmed 3 Cir., 135 F. 12, a case holding that a warranty of 3400 gross tons of iron pipe was not fulfilled by a shipment of 3258 tons. Or, at the election of the charterer, the breach of such a covenant may permit a rescission of the Charter Party. Clydesdale Shipowners' Co. v. William W. Brauer Steamship Co., D.C., 120 F. 854.

The "Atlanta" carried 487 tons of pipe as loaded—a difference of some 63 tons

from the capacity specified or approximately a 12% deficiency below the guarantee. The owner contends that the pipe was improperly loaded. It says that the pipe should have been "nested," that is, smaller pipes placed inside the larger ones. In this connection they rely, among other things, on "Modern Ship Stowage" published by the United States Department of Commerce where it is said (p. 382): "When a large quantity of cast iron pipes of varying sizes is shipped it is often possible to nest them by putting the smaller ones inside the larger, and so save considerable space."

The evidence as to this point is in sharp conflict. Captain Pantazopoulos himself was apparently uncertain whether it was proper procedure to nest or not to nest the pipe although he was of the opinion that the cargo was improperly loaded and that the stevedores were in "too much of a hurry." (Tr. of Evidence, p. 29, 32.)

As a matter of fact, about ⅓ to ½ of the pipe in the forward hold was nested. None was so loaded in the aft hatch. (Tr. of Evidence, p. 35, 136.) The exact reason why the stevedores stopped this method of stowage does not appear from the evidence. The Master testified that the pipes were slipping inside each other.

W. P. Jones testified for Caravan as an expert. He referred to the nesting of pipe as a "very abnormal practice." (Tr. of Evidence, p. 75.) On a ship with an aft hatch such as the "Atlanta" where the pipe had to be nested on the dock he thought such a procedure very unsafe. "The nesting of pipe is not good stowage; we never plan it," he said. From his personal examination of the aft hold of the "Atlanta" it would not have been possible under any conditions, he thought, to nest pipes in 18 foot lengths. (Tr. of Evidence, p. 146.)

Expert testimony on this subject was also produced by the owner. Mr. Martin Roberts testified that he would have nested the pipe in No. 2 hatch. However, the nesting there would have to have been done within the hatch, he said, as otherwise the pipe inside would slide out. Nesting is ordinary procedure "if you get in a jam for space." (Tr. of Evidence, p. 90.) However, he had never had any experience in discharging nested pipes and admitted that "it was not a normal stevedoring operation." He estimated that nesting pipes increases the time of labor about 20%. (Tr. of Evidence, p. 93.)

A diagram prepared by Mr. Jones shows that the stanchions in the aft hold of the "Atlanta" would have made it extremely difficult, if not impossible, to move 18 foot pipe therein for the purpose of nesting same. There was no space to swing the pipe. Mr. Nasios, the owner's representative, admitted that the vessel would not be seaworthy with pipe nested in the forward hatch and not in the aft hatch. (Tr. of Evidence, p. 137.) Captain Pantazopoulos also conceded that this was true. The fact was that when the "Atlanta" sailed from Tampico she was somewhat "down by the head." Some change of loading was made in order to trim her.

The question of fact involved is not an easy one. Certainly the "Atlanta" as loaded at Tampico did not comply with the owner's warranty as to capacity. The deficiency was a substantial and material one. In my opinion, a stevedore is not required to adopt out-of-the-ordinary methods of loading a ship, involving considerably more expense. There is nothing in the evidence suggesting that the stevedores were incompetent or that the "Atlanta" was not loaded according to the usual practices and standards prevailing at Tampico. The Agent under whom they operated was concededly one of the best. (Tr. of Evidence, p. 29.)

Clause 8 of the Charter Party provided that the charterers were to "load, stow and trim cargo at their expense under the supervision of the captain." Under such a charter the owner has a definite share of the responsibility and control as to the manner of loading. Knohr & Burchard v. Pacific Creosoting Co., D.C., 181 F. 856; The Giles Loring, D.C., 48 F. 463. Where the owner's guaranty of the ship's capacity is at stake the duty of the Master, even beyond precautions as to seaworthiness, is manifest. Captain Pantazopoulos and Nasios were present and observed the loading operations at Tampico. If they

made any real objections to the manner of stowage the record fails to reflect them. Pantazopoulos says that he told the stevedores that the ship was being loaded "very badly." (Tr. of Evidence, p. 29.) But there his protests died though the charter definitely conferred upon him the right to do something about the situation. As I appraise the facts, I must and do hold that there was a breach of the warranty as to the "Atlanta's" capacity to lift cargo.

*(2) Warranty as to Speed and Fuel Consumption.*

The charter represented that the "Atlanta" was capable of steaming, fully laden, under good weather conditions at about 10 knots on a consumption of about 10 tons of the best grade fuel oil. Owners contend that such a statement is a representation and not a warranty, citing The Beechpark (Denholm Shipping Co. v. W. E. Hedger Co. Inc.), D.C., 34 F.2d 572, 1929 A.M.C. 880. However, that was a District Court decision which was reversed on appeal. The Circuit Court of Appeals for the Second Circuit, in reversing the decision, held that where a steamer is described as being "capable of steaming about 11 knots to 12 knots an hour in good weather in smooth water on a consumption of about 32 to 34 tons best Welsh coal" —a warranty results rather than a representation, even though the statement is not expressly designated as a warranty. Denholm Shipping Co., Ltd. v. W. E. Hedger Co., Inc., 2 Cir., 47 F.2d 213. The Beechpark was cited in Romano v. West India Fruit & Steamship Co., Inc., 5 Cir., 151 F.2d 727 where the Court ruled in a decision by Judge Hutcheson that a charter representation that a ship has a speed of 9 knots per hour is a warranty and that it was breached when the vessel did not attain it between Cristobal and Miami.

The "Atlanta" had not been drydocked in about five months. She was admittedly foul, with some 5 feet of scale. Her speed was retarded as a result. Enroute to Tampico she averaged only 6 or 7 knots, steaming light. She arrived more than a day late at Tampico. Nasios testified that the ship did not try to make speed as her fuel was short and bad weather might arise. (Tr. of Evidence, p. 131.)

But this is hardly a satisfactory explanation in view of the warranty that the ship would be at Tampico on January 8th at 4:00 P.M. If I should give credence to the testimony of Nasios in this respect it would tend to solve the troublesome question as to waiver of the warranty of speed by Caravan's accepting the ship knowing of the deficiency in her speed. But independently of Nasios' explanation I am of the opinion that under the peculiar circumstances of emergency confronting both charterer and owner at Tampico there was no waiver of the warranty by Caravan.

Undoubtedly the "Atlanta" was delayed by extremely bad weather out of Tampico. The log shows storm conditions prevailing for all except a few days of the voyage to Puerto Cabello. But I am satisfied that it was not the storm that kept the "Atlanta" from making 10 knots enroute to that port. She may have been prevented by it from making 7 or 8 knots but not 10 or even 9 knots as she was incapable of the latter, fully laden. Moreover the "Atlanta" consumed considerably more fuel than the owners warranted. She was burning up to 5 tons more fuel per day than had been stipulated.

The admissions of Georgaros and the owners are entitled to much weight in considering any question as to Corinthian's compliance with the warranties. Whether valid or not, the "Addendum" is a deliberate admission by an agent authorized to deal with the charterer that there had been a breach as to capacity to lift cargo as well as in respect to speed and fuel oil consumption. On January 21st he writes Nasios telling him "The way the ship is now is no good at all." In his letter of February 17th to Nasseof, Georgaros goes into detail with respect to the "Atlanta's" failure to perform. On February 12th he had telegraphed the owners: "We guaranteed ship 10 knots on 10 tons of fuel and capacity minimum 550 tons. However ship did 6 knots on 15 tons and capacity is 480 tons." Nasios informed Georgaros: "The speed of the ship will be right after it goes to drydock." Neither Nasseof nor Nasios ever really challenged the assertions of Georgaros. Indeed, on February 16th the former clearly admitted the ship's inability

to live up to the original specifications when he instructed Georgaros to reduce speed 8-9 knots on "new contracts" and to increase fuel "about 11-12."

■ To overcome the effect of such admissions is a large order. In the opinion of the Special Commissioner the owner has failed to do so. Aside from the admissions, however, the evidence shows a material breach of the charter provision as to a warranted speed of "about 10 knots" on "about 10 tons" of fuel. Under the circumstances Caravan was justified in rescinding the contract upon discharge of the ship at Puerto Cabello.

### Georgaros' Authority to Enter Into the "Addendum"

On the arrival of the "Atlanta" at Puerto Cabello Georgaros entered into an agreement with Caravan terminating the Charter Party. In arriving at the settlement, Hydographic Office distances were used in computing the length of a hypothetical trip from Tampico to Puerto Cabello and back to Mobile. In determining the length of time the guaranteed speed and consumption of fuel oil was used to which was added the actual loading and discharging time at Tampico and Puerto Cabello. No other stopping time was used in the calculations. Caravan agreed to advance certain funds for repairs, stores, etc. which should be a direct lien on the vessel. It was also agreed that after drydocking (the expense of which Caravan later advanced) charterer was to have an option under a new charter for the same time as the original one at the same rate of hire, provided cargoes were available.

Was Georgaros authorized on behalf of the owners to enter into this settlement?

Under the agency agreement Georgaros had been given "exclusive and complete" authority, in certain respects including offering the "Atlanta" for charter. Caravan had seen this agreement and was bound thereby as to the limit and extent of Georgaros' authority, unless of course his right to enter into the "Addendum" otherwise appeared from the evidence.

In any appraisal of the scope of Georgaros' agency it must be confessed that there are many circumstances indicating a broad authority on his part in dealing with Caravan concerning the "Atlanta." His powers had not been exhausted by the execution of the charter party. He continued to be the representative of the owners in regard to the ship and was held out as their agent for doing so in their relations with the charterer. He was the only authorized representative of Corinthian in the United States. There was no one except him to whom the charterer or any one else could turn in connection with the "Atlanta". The principal had a somewhat nebulous identity. It was a Panamanian corporation. Its stockholders were in Greece. It had no office or officers in America. John Nasios was not elected President of the Company until after the litigation commenced. The "Atlanta" had no real home port. She was under Panamanian registry. Georgaros was trying to make the best of a bad situation. The "Atlanta" had failed to perform. If abandoned by the charterer, she became a waif of the seas. Her crew was unpaid. The owners were without means to move the vessel a single marine league through the Carribean. She badly needed drydocking.

■ Yet even in the light of all these circumstances I cannot bring my mind to the view that Georgaros possessed the right to abrogate the charter without the assent of his principal. Certainly the agency agreement did not permit, by its terms, such a step. It must be kept in mind that the so-called "Addendum" was not a new charter. It was not even an amendment of the previous one. It was neither more nor less than a termination of the charter and a settlement of accounts on an entirely different basis than the original contract provided.

■ In dealing with Mr. Georgaros on this subject Caravan acted on the assumption, as Mr. Barnes concisely put it in his testimony: "I would say that any man who had authority to enter into it has authority to abrogate it; I had no reason to go behind Mr. Georgaros." (Tr. of Evidence, p. 101.) I cannot agree that the right to make a charter confers upon an agent the accompanying right to unmake it. "Nei-

ther the master nor the broker acting for the owners can vary a charter party made by them or on their behalf." Carver's Carriage by Sea, Sec. 126; Oneida Nav. Co. v. Arkell & Douglas, Inc., D.C., 290 F. 827; 58 C.J., p. 121, Sec. 178. A broker's authority "to effect, vary, or rescind charters depends upon his special instructions at that particular time, and may be at any moment withdrawn." Scrutton on Charter Parties and Bills of Lading, 14th Ed., pages 45-47.

From the authorities I have examined I conclude that a power confided to an agent to make a contract does not constitute authority, without more, to abrogate the agreement that has been entered into and to make a binding settlement thereof. People making settlements with agents of another deal at considerable risk as to the latter's authority. I think that Georgaros' power to enter into the "Addendum" must be sought elsewhere than in the agency agreement or in the facts to which I have just alluded.

### Ratification

I have been at some pains to set forth at length the numerous communications between Georgaros and his principal after the "Atlanta's" departure from Tampico. One salient fact stands out in this record: Georgaros never got around to telling the owners directly and unequivocally that he had executed the "Addendum." When the agreement was already two days old he did cable the owners that the charterer "was dropping the charter". Five days later he writes to Nasseof that Caravan "is willing" to adjust on the basis which he did fully outline in that communication. But always Georgaros speaks in terms of the willingness of the charterer to do something which in reality was an accomplished fact. The testimony of Nasios was that he never saw the "Addendum" until the ship reached Savannah. The reasons for this reticence on the part of Georgaros I cannot divide and will not explore. His communications to Nasseof and Nasios are those of an agent seeking to obtain a ratification of an act already accomplished without telling the principal that he had already acted on

their behalf. But as I have said before we are not concerned with Georgaros' proper performance of his trust. He no doubt believed that he was doing what was best for the ship and that he had salvaged the most out of a bad situation. The question with which we are confronted is whether a ratification can be spelled out of the record.

(a) *Ratification by What the Parties Said.*

I do not think that the words of the parties amounted to any ratification or authorization to make the "Addendum". I have canvassed and re-canvassed the cables and communications between the principal and the agent. In all my experience I have never seen a mixed question of law and fact which presented a more difficulty solution that the one concerning Georgaros' authority and the validity of the "Addendum." Georgaros did his best to obtain a ratification. In my opinion he failed. When he informed Nasseof that Caravan "was dropping" the charter, what it was willing to do, and asking his advices, the latter cabled back: "Refuse cancel charter accept only drydocking ships debit consult lawyer. Notify John not discharge unless balance charter guaranteed."

On February 14th Georgaros repeated what the charterers proposed, stating that the lawyers agreed that such arrangement was very fair. He asked immediate advice as to whether it was acceptable. But Nasseof instructed him to accede only to drydocking and change of merchandise, stating, "Wish continue contract." He inquired, why, if the charterer was co-operative as Georgaros said, it was *seeking* to drop the contract.

In his letter of February 17th Georgaros carefully outlined what the charterer had proposed. He did not say that a settlement had been made—only that "they have agreed to settle." But neither Nasseof or Nash ever agreed in so many words. On February 21st Georgaros asked authority to settle the original charter for $6000. He never obtained it. On the contrary, Nasseof informed him that the charterer's figures were "unjust."

■ On February 20th Georgaros cabled Nasseof that the "Atlanta" was "on own time." But this is not a statement that the charter had been abrogated by agreement and that a settlement had been made. Knowledge that Caravan had dropped the charter is not sufficient of itself for a ratification. What is necessary is knowledge that the charter had been cancelled by the agent and of the *terms* of the settlement by the agent. The most the owners ever knew, on the basis of the record before me is that the charterer had dropped the charter, why it had done so and that it desired to do so subject to a certain proposed basis of settlement.

Much reliance is placed by Caravan upon the cable of February 12th in which Nash, after criticizing Georgaros for not receiving the hire in advance, says: "Now they have us in their hands. * * * Now because they have us in that position, do what you please, the best." (Another translation submitted is: "Now when they double crossed us do what you think is the best.")

The language just quoted is certainly capable of being construed as an authorization to do anything necessary in the way of acceding to the charterer's proposals or making any other arrangements that were best for the owners under the circumstances. But this was an authorization which at most contemplated some future action of Georgaros, not a ratification of an unknown past act. Georgaros never did anything in reliance on it. He apparently never supposed that it gave him any authority because he continued to seek Nasseof's assent to a settlement. But this aside, if any adequate authorization to make the "Addendum" were given in this cable it was counter-manded or counter-balanced by the cable from Nasseof on the same date instructing Georgaros not to cancel. Since the rights of a third party based upon such authorization had not meanwhile intervened the power could be withdrawn at any time by the principal. Moreover, it will be noted that Nasios' telegram did not end on any note of plenary authority "to do what is best". He concludes with the request that Georgaros advise him as to what he intends to do to correct his mistake.

To find Corinthian's approval of the settlement we must look to the actions of the parties rather than to their words. It is in what they did rather than in what they said that I find such approval for what the "Addendum" embodied.

### (b) *Ratification by Conduct*

Corinthian knew that the charter had been dropped by Caravan at Puerto Cabello. This knowledge did not depend on what Georgaros said. Nasios suspected that it was in the air independently of Georgaros' cable of February 10th. "I am afraid soon as we unload cargo they will walk out," he had cabled the Agent at that time, seeking more information as to the "adjusted rate." On February 20th, after the drydocking, Georgaros had informed the owners that the "Atlanta" was on her "own time ready Curacao awaiting orders." Nasseof replied, asking "how arranged matters." This only confirmed what the owners indubitably realized. I cannot accept Nasios' statement that he had no idea that the charter had been abandoned until he got to Savannah. (Tr. of Evidence, p. 132, 136.)

■ Moreover, the owners well understood the conditions on which Caravan proposed to adjust the charter hire. Georgaros had transmitted in full the charterer's offer of settlement and the revised basis of hire which that proposal embodied. What Caravan was willing to do in that regard had been repeatedly placed before the owners by Georgaros who asked for a decision. Among the terms included in the offer was the proposal of Caravan to advance drydocking costs and to make certain advances to keep the ship moving. These were substantial benefits to a company in the financial condition that Corinthian was. The owners were in no position to obtain or finance such necessities. Caravan offered to make the advances in question, amounting to several thousand of dollars on certain conditions. At Curacao alone the outlay was $4,007.63. The owners failed to accede in words. But their

actions bespoke acceptance. They took the benefits. They must suffer the burdens. One cannot accept the good in an agent's unauthorized act and reject the bad. Haney School Furniture Co. v. Hightower Baptist Institute, 113 Ga. 289, 296, 38 S.E. 761. See also 2 C.J., §§ 657, 658, page 922 f., 923; 3 C.J.S., Agency, § 319.

But it is argued that acceptance of the drydocking and other advances was perfectly consistent with the continuance of the charter in that provision was made therein for the charterer to underwrite such expenses and to credit the advances therefor against the hire. Nasios testified that he was simply following Dao's instructions about the drydocking and sailing, the latter being the charterer's agent. (Tr. of Evidence, pp. 124, 125, 133.) I cannot agree. The owners knew the charterer had abandoned the charter. The advances were explicable upon no other theory than that Caravan thought its offer of adjustment had been accepted and that it was acting on that premise. What Corinthian wants to do is to close its eyes in order not to see how or why the benefits accrued while extending its palm to receive them. Certainly Nasios was not so naive as to believe that Caravan was advancing, at so late a date, thousands of dollars for drydocking costs and other necessities in performance of a charter party it had abandoned. That Nasios supposed the charterer was actuated purely by motives of charity is wholly inconceivable. Corinthian had to know that the payment for drydocking was referable and attributable to an adjustment of the charter on the basis of the proposals which had been fully outlined to the owners by Georgaros.

On February 14th Nasseof cabled Georgaros: "Accept change merchandise drydock ship but wish continue contract." But Caravan was ignorant of this and all other communications which passed between principal and agent. It was never informed of any repudiation of the "Addendum". It had every right to think that its offer of settlement had been accepted. It never knew that there was any conditional acceptance. It never knew that the owners had told Georgaros to accept drydocking and change of merchandise subject to continuation of the charter. An intention to accept an offer is not essential to a contract nor is it necessary that a party understand the legal operation of his acts. 1 Williston on Contracts, Revised Ed., p. 190 f., Sec. 66. The acceptance by Corinthian of the benefits of drydocking and other benefits meant, under the circumstances, acceptance of the entire proposal. Acceptance of an offer may be by act as well as word. 17 C.J.S., Contracts, § 41(d), page 374; 12 Am.Jur., p. 516, Sec. 19 (note 4); Restatement, Contracts, Sec. 21; 1 Williston, p. 252, Sec. 90. No question of the Statute of Frauds is involved. See Union Fish Co. v. Erickson, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261.

I am of the opinion that the taking advantage of Caravan's offer to guarantee the dry-docking costs, etc. necessarily knowing that it was part and parcel of the terms of a proposed settlement and Corinthian being fully aware at the time that the charterer no longer considered itself under the charter amounted to an acceptance of the offer as communicated. An implied contract resulted. It is a case of entering into a settlement originally rather than ratifying one made by an agent. But between a ratification of the "Addendum" proper and a contract arising from acceptance of Caravan's offer there is only the difference of methodology.

As a matter of fact, the practical effect of ratification of the Addendum, or of the settlement proposed, is not great. Even if the terms of the "Addendum" could not be upheld the parties would stand in relatively the same position. With the charter terminated by Caravan after the unloading at Puerto Cabello, the right to rescind following as a matter of course from the decision I have made as to breach of the warranties, the Commissioner would have to compute the earned hire on the basis of the time the boat was actually under charter at the contracted rate, deducting a proportionate amount for the deficiency in cargo capacity and also deducting the time lost and extra fuel costs accruing by the failure of the vessel to measure up to the

speed and fuel warranties enroute from Tampico, making due allowance for the part of the delay attributable to the storm. This of course would be difficult. But a satisfactory and reasonable estimate can be made. The resulting figure would be found I think, to approximate the earned charter hire as computed in the "Addendum".

### Maritime Lien of Caravan and Amount of Its Claim for Advances

The advances of the charterer to keep the "Atlanta" moving constitute a maritime lien. The rule is now established that the charterer of a vessel who furnishes supplies and services to the vessel is entitled to subrogation and to a maritime lien where it pays materialmen and those furnishing services and supplies. Rodriquez v. The G. K. Dauntless, D.C., 70 F. Supp. 958; Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197. The charter did not prohibit Caravan from relying upon the credit of the vessel.

All of the purposes for which the advances were used or made were maritime in nature. They consisted in general of the following: Tow bill (The Sleepy Hollow D.C., 114 F. 367); services of the custom house (The Aina, D.C., 40 F. 269); cables to owners (ibid); medical services and supplies (Methodist Episcopal Hospital v. Pacific Transport Co., D.C., 3 F.2d 508); repairs (The Diane, D.C., 45 F.Supp. 510; The Glide, 167 U.S. 606, 17 S.Ct. 930, 42 L.Ed. 296); pilot's fees (The Fort Armstrong D.C., 51 F.2d 1063); fumigation (The Ascutney, D.C., 278 F. 991); drydockage (The Vidal Sala, D.C., 12 F. 207); supplies for slopchest (The Fortuna, D.C., 213 F. 284); food (The Reina Victoria, D.C., 298 F. 765); transportation for supplies (The Artemis, D.C., 53 F.2d 672); coal and fuel (The Philomena, D.C., 200 F. 873); and other necessaries reasonably needed in the ship's business (Walker-Skageth Food Stores v. The Bavois, D.C., 43 F.Supp. 109).

Since the settlement outlined in the "Addendum" has been upheld there can be no dispute as to the correctness of the accounts or the liability of the charterer and owners between themselves. As the parties went off the charter at Puerto Cabello and since the settlement eliminated the charterer's obligations at Santa Marta and on subsequent trips, the contentions that the charterers should be charged with certain costs at those ports cannot be upheld. None of the other items has been attacked. Caravan is entitled to a maritime lien for its claim in the amount of $7,696.03.

### Claim of Master of Wages

Demetrios Pantazopoulos, Master of the "Atlanta," filed an intervention seeking the enforcement of a lien arising by reason of non-payment of his wages in the amount of $1438 at the rate of $400 per month. Under the articles signed by the crew at Mobile Mr. Pantazopoulos was to be paid $400 per month. His contract with the owners executed at Piraeus, Greece, prior to the crew coming to America called for what amounted to an equivalent salary in British Pounds according to the Greek rate. His claim represents unpaid salary for January, February and March, 1948 and $238 for December, 1947, in which month only a part of his wages were paid. The uncontradicted testimony is that the amount of $1438 was due to the Master at the time of trial. (Tr. of Evidence, p. 25f.)

To support his claim of lien Captain Pantazopoulos relies on the statutes of the Republic of Panama. The safest way to prove a foreign statute is by producing an authenticated copy. Authentication may be achieved in various ways, among them

(a) by a certificate of the proper officials of the country involved certifying as to such statute and

(b) by testimony of a man of law, acquainted with the laws of the nation involved.

In the present case the proctor for Captain Pantazopoulos produced a photo-

static copy of certain laws of Panama. On the fly-leaf is found the following:

Republica De Panama
Codigo De Comercio
Edicion Official
Barcelona—1917

According to the translation submitted to the Court, Article 1232 [1] of this Commercial Code of Panama declares:

"All the provisions of this chapter respecting wages, indemnification, subsistence, ransom shall be applicable to the master, officers, and members of the ships complements to an extent proportional to their respective salaries."

Article 1231 [2] of the Code in question reads according to the English translation:

"The vessel and the freight shall be especially liable for the wages of the seamen and the indemnification to which they may be entitled in accordance with the provisions of the chapter on Maritime claims."

■ As to the sufficiency of the proof of the Panamanian lien statutes it would have simplified matters greatly if the proctor for Captain Pantazopoulos had secured a certified copy thereof from proper officials of Panama. In view of the correspondence he had concerning such laws with a firm of attorneys in that country such an opportunity seems to have offered itself. However, the Commissioner thinks that under all the facts a sufficient showing has been made to admit the Panamanian law creating a master's lien for unpaid salary. See Wigmore on Evidence, III, Sec. 1684, page 2159.

A liberal spirit on the part of the federal courts has marked their approach to questions of proof of foreign statutes. As said by Judge Lowell in The Pawashick, (19 Fed.Cas., No. 10,851): "It was soon found, in trials in the United States that the danger of mistaking the laws of the other states was on the whole, a less evil than the danger of injustice and delay, if the strict proof were required in every case." The learned District Judge cited certain cases in which foreign statutes had been received where the evidence of authenticity was merely that they had been bought of the public printer. In Ennis v. Smith, 14 How. 400, 14 L.Ed. 472, Mr. Justice Wayne who seldom permitted the merits of a case to be prejudiced by technicalities, after referring to the various ways in which foreign statutes may be proved, stated that such modes of proof are not exclusive and that the Code Civil of France which had been sent to the Supreme Court from that country under a mutual exchange of statutes and which carried an endorsement to that effect could be properly received in evidence. "The only rule to be made out of the late American cases," said Judge Lowell in the case referred to above, "is that the copy of the statute must be shown, to the reasonable satisfaction of the court, to be genuine."

The evidence here satisfies the Commissioner in that respect. We have a photostatic copy of the Commercial Code of Panama on which appears the seal of that Republic and the statement that it is the "official Edition." The title page shows that the volume in question is in the Library of the New York County Lawyers' Association. Every attorney who has visited that library is familiar with its high standing as a law library. The fact that a photostat rather than the original statute book is produced is of no moment. 22 C.J., § 1120, page 918; 32 C.J.S., Evidence, § 709.

The Commissioner is informed outside the strict record of the case, that maritime liens have been subsequently dealt with in Panama by a law enacted in 1946 which supersedes the old statute. However, the

---

[1] Art. 1232. Todas las disposiciones de este Capitulo concernientes a salarios, indemnizaciones, asistencia y rescate, seran extensivas al capitan, oficiales y demas individuos de la tripulacion, por la parte proporcional que corresponda a sus salarios respectivos.

Los contratos del capitan se regiran por las disposiciones de este capitulo en cuanto no se opongan a lo dispuesto en la Seccion Segunda del Capitulo IV.

[2] Art. 1231. La nave y el flete estaran especialmente afectos a los salarios de la tripulacion y a las indemnizaciones a que esta tenga derecho conforme a lo dispuesto en el Capitulo sobre credito maritimo.

new statute in no way seems to impair the rule under the former "Codigo de Comercio" that the master of a ship has a lien on the vessel for his compensation.

Of course, under the general maritime law as administered in America a master has no lien on the vessel for his wages. Steamboat Orleans, 36 U.S. 175, 9 L.Ed. 677. This rule has been criticized. In Norton v. Switzer, 93 U.S. 355, 365, 23 L.Ed. 903, it was said: "Seamen have a maritime lien for their wages wherever the services may be rendered; but that just rule has never extended to the master except in cases where the lien is created by statute."

However, it is equally well-established that admiralty courts in this country will give effect to and enforce the lien extended under foreign statute to the master of a foreign vessel for his unpaid wages. The Felice B., D.C., 40 F. 653. As stated in The Angela Maria, D.C., 35 F. 430, 431, such liens as that of a master for his wages under a contract "made on Italian soil or under the Italian flag are regulated as to lien and priority by the Italian law, which this court will enforce by comity." Other cases where American courts have enforced masters' liens under foreign laws include The Havana, 11 Fed. Cas.No.6226; The Brig Wexford, D.C., 7 F. 674; The Fort Gaines, D.C., 18 F.2d 413; 1927 AMC 655; The Estrada Palma, D.C., 8 F.2d 103, 1923 AMC 1040; and The Rupert City, D.C., 213 F. 263. In the latter case the fact that the contract of hire was made in America and that the master was an American did not affect the operation of the laws of Great Britain creating a lien on behalf of the master for his wages on British ships.

In view of the showing made as to the law of Panama under the flag and registry of which nation the "Atlanta" sailed, the lien of Captain Pantazopoulos must be recognized against the fund to the extent of his unpaid wages in the amount of $1438.00.

## Tort Claim of Oceanic Ship Scaling and Painting Company

The parties have stipulated that the amount of the ship's liability for the loss of the lighter belonging to Oceanic Ship Scaling and Painting Company is $1000 and that such claim constitutes a maritime lien. The evidence fully sustains the contention that the loss was caused by the unauthorized use of the lighter by the crew of the "Atlanta." Admiralty courts have jurisdiction of suits in rem for conversion of property on navigable waters. Hugh D. MacKenzie Co. v. Lydia Steamship Company, 2 Cir., 1 F.2d 18. A maritime lien exists for such tortious damages. The actual damages exceeded the amount stipulated. The claim of Oceanic Ship Scaling and Painting Company in the amount of $1000 is therefore directed to be paid from the fund on deposit in the registry of the Court.

## Claim of Marine Surveyor

The evidence shows that during the latter part of 1946 R. M. Cook, a marine surveyor, was approached by the owners and asked to inspect the vessel in drydock at Savannah where the "Atlanta" was undergoing conversion into a cargo carrier. Until her sale by the United States government in 1946 she had been in the service of the Coast Guard as a lightship tender. During the early months of 1947 Mr. Cook supervised the making of certain changes in the hold of the vessel and the obtaining of a "load line" which is essential to the navigation of vessels of over 250 tons. Mr. Cook also advised as to alterations necessary for carying cargo, the location of hatches, cleats, vent pipes, scuppers, etc. Prior to her conversion the "Atlanta" was entirely unsuited for carrying cargo, being adapted only to her former duties of placing buoys and bringing them in for repairs. The indebtedness claimed by him amounts to $750. All parties concede that that sum represents the reasonable value of the services rendered to the ship by him as a marine surveyor.

It is well established that the services of marine architects and surveyors in the reconstruction of vessels previously engaged in trade and commerce constitute a maritime contract giving rise to a maritime lien. The Schuylkill, D. C., 249 F. 781, affirmed by the Circuit Court of Appeals, Second Circuit, 267 F. 811. Like-

wise, the cost of a survey to determine the nature and extent of the repairs needed to make a vessel seaworthy so as to entitle her to registration under the American Bureau of Shipping has been held to create a maritime lien upon the ship. The Susquehanna, 4 Cir., 295 F. 322. In the light of such cases as Hardy v. The Ruggles, 11 Fed.Cas.No.6,062 and New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482, one could hardly contend that the conversion of the Atlanta amounted to original construction outside the admiralty and maritime jurisdiction.

It is contended, however, that no maritime lien arises with regard to Mr. Cook's services because the vessel prior to her conversion was not an instrument "of navigation, commerce and trade," she having been a United States Coast Guard vessel. To support this position the case of The Geo. L. Harvey, D.C., 273 F. 972, 974 is cited. A District Court in Washington there ruled that services in converting a sub-chaser to a fishing boat following her sale to an individual by the Navy Department do not give rise to a maritime lien or come within the admiralty jurisdiction. "The war vessel," said the Court, "was not related to any rights and duties pertaining to commerce, navigation, and trade, and not until she was fitted suitably for such business was she constructed * * *."

I think the case of the "Atlanta" and "The Geo. L. Harvey" are different. Here the ship was not a war vessel but a light ship tender formerly engaged in the handling of aids to navigation. Clearly such a vessel regardless of her ownership by the government was an instrumentality of navigation. Anything more conducive to the safe navigation of vessels at sea than the operation of such a vessel can scarcely be conceived. Her services as a buoy tender were intimately related to navigation, commerce, and trade. The power of the federal government to maintain light-ships, buoy tenders and other navigational aids grows out of the authority delegated to Congress to regulate *commerce* among the states and with foreign nations.

We have before us simply a case where a vessel was converted from an in-strument of navigation into an instrument of commerce. A maritime contract was involved. A maritime lien for the architect's services arose. The value of Mr. Cook's services must be and is fixed under the evidence at $750. His lien on the funds is recognized to that extent.

### Priority

This Report up to this point has dealt with strictly maritime liens against the "Atlanta."

It appears likely that sufficient funds are in the registry of the Court to enable payment in full, after expenses are met, of all previously undischarged maritime liens, namely, that of Caravan, the Master, Oceanic Ship Scaling & Painting Company and of the marine surveyor. No question therefore presents itself to the Commissioner with respect to priorities as between maritime liens. However, in the event such an issue hereafter happens to arise in this case I will say that the order in which I have dealt with the foregoing liens represents my views as to their rank inter se.

Interventions of
- John Georgaros for commissions;
- Kolgaklis, Nash and Vergas under first mortgage;
- James C. Nash under second mortgage.

It appears likely that a small balance will remain after all maritime liens and expenses are satisfied. The claimants to this residuum are not maritime lien-holders. It is plain that Mr. Georgaros does not possess a maritime lien for his commissions for securing a charter party. The Thames, D.C., 10 F. 848; 1 Benedict on Admiralty, 6th Ed., p. 138, Sec. 67. The mortgage creditors concede since the "Atlanta" is of foreign registry, that their securities have no status as preferred mortgage maritime liens under the Ship Mortgage Act of 1920, as amended, 46 U.S.C.A. § 911 et seq.

Proctors for Messrs. Kolgaklis, et al. as holders of the mortgage dated November 29, 1947, correctly contend that the

jurisdiction of an admiralty court is not exhausted with disposition of maritime liens against a fund arising after the sale of a vessel. If a balance remains, the Court may proceed to adjudicate and determine the validity and rank of the non-maritime claims. The Atlantic City, 3 Cir., 220 F. 281, Ann.Cas.1915D, 50. This power apparently does not extend to payment of non-maritime claims in personam, being limited to lien claimants. The Ada, 2 Cir., 250 F. 194; Topfer v. The Schooner Mary Zephyr, D.C., 2 F. 824.

■ The evidence shows that on November 29th, 1947, Corinthian Steamship Company mortgaged the "Atlanta" in favor of Theodore A. Kolgaklis, James C. Nash and Alexander Vergas, intervenors, to secure an indebtedness of $20,000 with interest. This mortgage which was duly recorded in the public records of Chatham County, Georgia, created a lien under the laws of that State. There has been a default and the entire principal sum and interest is due. On March 29, 1948, another mortgage was placed on the "Atlanta" by Corinthian. The mortgage holder was James C. Nash and the indebtedness secured amounted to $10,000 as to which there has been a default. Between the two mortgages, the lien of the former takes precedence as respects any balance in the registry of the Court.

■ Mr. Georgaros seeks commissions on the charter hire of the "Atlanta" for the whole duration of the charter party as well as the option period. I make no effort to adjudicate the validity or amount of his claim. No contention has been advanced that he possesses any lien under the laws of New York for unpaid commissions. His claim is purely in personam and of necessity yields to the mortgage lien.

In the light of these views, any balance in the registry must be awarded to Kolgaklis, Nash and Vergas under their mortgage and that disposition of such residuum is directed to be made.

## Interest

■ In admiralty in the awarding of interest there is more leeway for judicial discretion than in other branches of the law. 1 Am.Jur., p. 616, Sec. 140. But here as elsewhere the question of whether the demand is liquidated or not is largely controlling. 1 Corpus Juris, § 350, page 1363; 1 C.J.S., Admiralty, § 205. The amount of Caravan's claim did not become fixed until now. The same is true in respect to all the other maritime lien claimants except Captain Pantazopoulos. The Master's wages were fixed and were owing and he is entitled to interest thereon. The Swallow, 23 Fed.Cas.No.13,665. Interest at 7% per annum is awarded on the indebtedness of $1438.00, from the time of the filing of the libel on his behalf. The other maritime claims will draw interest only from the date of this Report at which time they become liquidated as to amount for the first time.

## Findings of Fact and Conclusions of Law

The foregoing Report and Opinion is submitted for consideration of Honorable Frank M. SCARLETT, Judge of the United States District Court for the Southern District of Georgia, in accordance with the order of reference. Accompanying the Report is a transcript of the evidence, depositions and all documentary evidence and exhibits introduced or submitted by the parties during the trial.

The following Findings of Fact and Conclusions of Law are submitted:

### Findings of Fact

1. All findings of fact which appear in the foregoing opinion and Report of the Special Commissioner are hereby incorporated by reference in these findings of fact.

2. The Agent for Corinthian Steamship Corporation, John Georgaros, was authorized to enter into the charter party and same is binding in all its terms and conditions upon the owners of the "Atlanta."

3. The specifications in the Charter Party as to speed, consumption of fuel and cargo capacity of the "Atlanta" constituted warranties.

4. Corinthian breached such warranties in that the "Atlanta" did not have the capacity, speed or fuel consumption warranted. There was no waiver thereof by Caravan Shipping Company and it was entitled

to and did rescind the charter party at Puerto Cabello.

5. Georgaros was not empowered under the express terms of his agency or under the facts to enter into the "Addendum" of February 8, 1948, abrogating the charter and settling the accounts, etc. between the parties thereto on a revised basis as set forth therein.

6. The "Addendum" was not ratified as such by Corinthian.

7. However, Corinthian is bound by the terms of settlement proposed by Caravan and communicated to the owners by the Agent, Georgaros, in view of its acceptance of certain benefits under such offer, namely, advances for the use of the ship and the payment of drydocking costs, the owners knowing that the charter had been dropped by Caravan.

8. The amount owing Caravan Shipping Corporation by reason of advances made by it for necessaries, supplies and repairs in the operation of the ship, less earned-charter hire due Corinthian under the settlement, is $7696.03.

9. The wages due Captain Pantazopoulos as Master of the "Atlanta" is $1438.

10. The tort claim for damages to Oceanic Ship Scaling & Painting Company for which the "Atlanta" is liable, is fixed at $1000.00 under the stipulation of the parties.

11. The value of the services of R. M. Cook as Marine Surveyor in connection with the "Atlanta" is $750.

## Conclusions of Law.

1. The United States District Court for the Southern District of Georgia has jurisdiction in the premises and said cause is within the maritime and admiralty jurisdiction of the United States.

2. All conclusions of law which appear in the foregoing opinion and Report of the Special Commissioner are incorporated by reference in these conclusions of law.

3. The crew of the "Atlanta" possess a maritime lien of paramount rank for unpaid wages. The stipulated and agreed value of such wages is $9,900 which amount, after findings of fact and conclusions of law to that effect, was paid to the crew during the course of the trial under an interlocutory decree.

4. The United States of America is entitled under the stipulation of the parties to the payment of $390 in full settlement of the fines and penalties imposed in connection with the "Atlanta" by the Immigration Service of the United States.

5. The Agent for Corinthian Steamship Corporation, John Georgaros, was authorized to enter into the charter party and same is binding in all its terms and conditions upon the owners of the "Atlanta."

6. The specifications in the Charter Party as to speed, consumption of fuel and cargo capacity of the "Atlanta" constituted warranties.

7. Corinthian breached such warranties in that the "Atlanta" did not have the capacity, speed or fuel consumption warranted. There was no waiver thereof by Caravan Shipping Company and it was entitled to and did rescind the charter party at Puerto Cabello.

8. Georgaros was not empowered under the express terms of his agency or under the facts to enter into the "Addendum" of February 8, 1948, abrogating the charter and settling the accounts, etc. between the parties thereto on a revised basis as set forth therein.

9. The "Addendum" was not ratified as such by Corinthian.

10. However, Corinthian is bound by the terms of settlement proposed by Caravan and communicated to the owners by the Agent, Georgaros, in view of its acceptance of certain benefits under such offer, namely, advances for the use of the ship and the payment of drydocking costs, the owners knowing that the charter had been dropped by Caravan.

11. Caravan is entitled to recover the amount of $7696.03 from the fund in the registry of the Court. The claim of Caravan in that amount constitutes a maritime lien. Interest thereon is denied as the claim was not liquidated until now.

12. Under the laws of Panama (which were sufficiently proven) the Master of the "Atlanta" possesses a maritime lien for his

wages which will be recognized in our Courts. He is entitled to recover from the fund the amount of $1438 with interest thereon at 7% per annum from the date of filing of his libel.

13. Oceanic Ship Scaling & Painting Company has a maritime lien for its tort claim against the "Atlanta" and is entitled to recover, without interest, from the fund in the registry of the court, the sum of $1000.

14. R. M. Cook, Marine Surveyor, has a maritime lien for the services rendered by him to the ship and is entitled to recover the amount of $750 therefor, without interest.

15. Corinthian Steamship Corporation is indebted to Theodore A. Kolgaklis, James C. Nash and Alexander Vergas under a mortgage dated November 29, 1947, in the amount of the principal sum provided therein and interest. Such claimants possess a lien under the laws of the State of Georgia entitling them to any residuum remaining in the registry of the Court after discharge of the maritime liens and expenses of this litigation. The Special Commissioner does not pass upon the claim of James C. Nash under his mortgage dated March 29, 1948 covering the "Atlanta" or the claim of the Agent, Georgaros, for broker's commissions as such claims do not constitute maritime liens and no funds will be left in the registry of the Court after payment of expenses and of claims having greater rank.

16. In view of the fact that it appears that all maritime liens against the "Atlanta" can be satisfied from the balance in the registry of the Court it is unnecessary to pass definitively upon the respective priorities of the maritime liens. However, in event the question of priority may hereafter arise, the order in which such liens are discussed in the foregoing Report and opinion represents the present views of the Special Commissioner in respect thereto. As to the priority as between Caravan's claim for advances, etc. and the Master's lien under foreign law see The Estrada Palma, D.C., 8 F.2d 103, 1923 A.M.C. 1040.

17. Corinthian Steamship Corporation is not entitled to recover under its cross-libel and its claim therein set forth is denied.

Respectfully submitted, this 6th day of August, 1948.

Anderson, Connerat, Dunn & Hunter, of Savannah, Ga., for Caravan Shipping Corporation.

Harry P. Anestos, of Savannah, Ga., for Corinthian S. S. Co., S. A.

Stephens & Gignilliat, W. Leon Friedman, and R. W. McDuffee, all of Savannah, Ga., for Theodore A. Kolgaklis, James C. Nash, and Alexander Vergas.

Robert E. Falligant, of Savannah, Ga., for Oceanic Ship Scaling & Printing Co., Inc.

William F. Braziel, of Savannah, Ga., for Demetrious Pantazopoulos, Captain, S.S. Atlanta.

John J. Sullivan, of Savannah, Ga., for R. M. Cook, Marine Surveyor.

George G. McCoy and George N. Peter Pahno, both of Savannah, Ga., for Ioannis Giannelis et al., members of crew S.S. Atlanta.

Albert L. Cobb, of Savannah, Ga., for John Georgaros.

O. H. Page, Jr., of Savannah, Ga., for Atlantic Coast Line R. Co.

J. Saxton Daniel, U. S. Dist. Atty., of Savannah Ga., for the United States.

SCARLETT, District Judge.

There being no exceptions filed to the Special Commissioner's report, but the parties affected being in Court and consenting:

It is ordered, decreed and adjudged that the report of the Commissioner be adopted and approved and made the order and finding of this Court, except that by consent of all parties judgment is rendered for the Caravan Shipping Corporation in the sum of Six Thousand Seven Hundred Fifty ($6,750) Dollars instead of the sum shown in the Commissioner's report; in all other respects, the same being confirmed as rendered.

The Clerk of this Court will forthwith distribute the sums found for the parties to their respective attorneys of record, from

the proceeds of sale of said vessel now on deposit in the registry of this Court.

After evidence heard, a reasonable fee is fixed for A. A. Lawrence, Esq., Special Commissioner, in the sum of One Thousand Two Hundred Fifty ($1,250.00) Dollars and One Hundred ($100) Dollars to said Commissioner for out-of-pocket expenses incurred by him in the preparation and mimeographing of his said report.