## SPERBECK v. A. L. BURBANK & CO., Inc.

No. 265, Docket 22001.

United States Court of Appeals Second Circuit.

Argued June 6, 1951.

Decided July 11, 1951.

Jacob Rassner and Herbert R. Bedell, New York City, for plaintiff.

Hanrahan & Dougherty, New York City (William R. Brennan, Jr., New York City, of counsel), for defendant.

Before CHASE, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. As the evidence sustains the judge's findings on the issues of defendant's negligence and unseaworthiness, we affirm the dismissal of the first cause of action.

2. On the findings, which are not "clearly erroneous," Sperbeck was a seaman. Carumbo v. Cape Cod Steamship Co., 1 Cir., 123 F.2d 991; Sullivan v. United States, 2 Cir., 179 F.2d 924. He was therefore entitled to be paid the expense of maintenance and cure. The evidence sustains the finding that defendant had failed to pay it.

There remains the question of the survival of the claim for the unpaid expense of maintenance and cure which, of course, accrued before Sperbeck's death.[1] Judge Coxe has held that such a claim does survive.[2] The Third Circuit, without discussion, has also so held.[3] It has been decided that a

---

1. The claim, of course, is not within the Jones Act, 46 U.S.C.A. § 688.

2. Hegsted, Administrator v. Standard Transp. Co., 1934 A.M.C. 190 (D.C. N.Y.).

3. Jordine v. Walling, 3 Cir., 185 F.2d 662. See also Killian v. American West African Line, Inc., 163 Misc. 587, 296 N.Y.S. 293.

hospital can recover from a shipowner, by way of subrogation, the value of treatment of a seaman when the defendant failed to supply it;[4] if that is correct, the claim here survived, for usually the same test applies for determining assignability (or subrogation) and for determining survival. We have discovered no other direct authorities (except a dictum in Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368, which we shall discuss later).

■ Absent a statute, the general rule is that claims sounding in contract survive the death of either the obligor or the obligee, while those sounding in tort, if of a "personal" character, do not. These distinctions, it has been said, lack any present rhyme or reason.[5] If we turn for light to history, we find that the origin of the non-survival of "personal" tort claims is ancient and obscure.[6] Some say that it came about through the careless use by English judges of the maxim "actio personalis moritur cum persona," and that in particular Coke —often disingenuously inventing or misapplying sententious Latin phrases when he lacked good arguments or precedents[7]— with unfortunate success popularized his erroneous version of that maxim.[8] In

4. Methodist Episcopal Hospital v. Pacific Transport Co., D.C.Cal., 3 F.2d 508; cf. The Atlanta, D.C., 82 F.Supp. 218, 235; but see Hegsted, Administrator v. Standard Transp. Co., 1934 A.M.C. 190 (D.C. N.Y.).

5. Prosser, Torts (1941) 953; Street, Foundations of Legal Liability (1906) 60; Pollock, Torts (12th ed. 1923) 60, 66.

6. Prosser, Torts (1941) 950; 3 Holdsworth, History of English Law (3d ed. 1923) 331–336, 576–585, 676–677; Winfield, Death As Affecting Liability in Tort, 29 Col.L.Rev. (1929) 239.

7. See, e. g., Thayer, A Preliminary Treatise On Evidence (1898) 185 note 4; Radin, Anglo-American Legal History (1936) 285, 853; Holdsworth, loc. cit. 576; Wigmore, Evidence (3d ed. 1940) § 2036 note 3, § 2250 note 9; Usher, Rise and Fall of The High Commission (1913) 191, 192; Veeder, The English Reports, 2 Select Essays in Anglo-American Legal History, 131–132; Bolland, Manual of Year Book Studies (1925) 85–86; Frank, If Men Were Angels (1942) 225 note. U. S. v. Forness, 2 Cir., 125 F.2d 928, 938–939 note 31.

8. Holdsworth, loc. cit. 576; Goudy, in Essays in Legal History (1913) 215, 226. But see Winfield, loc. cit. at 244.

No doubt Latin often in the past unduly impressed many lawyers. See Smith, The Use of Maxims in Jurisprudence, 9 Harv.L.Rev. (1895) 13, 25–26: "Second, the fact that the great majority of legal maxims are clothed in the words of a dead language has had, in some instances, the effect of preventing proper inquiry into their meaning. A phrase couched in Latin seems to some persons invested with 'a kind of mysterious halo.' Of course, Judge Lord was right when he said: 'There is nothing of mystery or of sanctity in the words of a dead language.' But no one who reflects on the subject can doubt that some useless Latin maxims, and some untrue Latin maxims, have continued current, and that other Latin maxims have been misapplied, when this would not have happened if those maxims had been expressed only in the vernacular. How else can we account for the way in which certain phrases are put forward as containing the reason for a rule, when the same phrase reduced into plain English is obviously nothing more than a restatement of the rule itself? A phrase, when put to such a use, may fairly be characterized as a 'question-begging maxim.' It is not an explanation; 'it is merely an artificial statement of the thing to be explained'; it is 'dogma,' not 'reasoning.' Lord Bacon tells us that he put the maxims in Latin, because he regarded that language 'as the briefest to contrive the rules compendiously, the aptest for memory, and of the greatest authority and majesty to be vouched and alleged in argument.' No doubt these advantages are entitled to consideration; but there is the obvious disadvantage that maxims 'put in Latin' will be more liable to be misunderstood by the average lawyer than by a man of Bacon's scholarship. And although the maxims have now been translated by modern editors, yet they are still generally cited in their Latin garb."

In our day, long English words of Latin origin—sometimes in the form of sociological or pseudo-scientific gobblydegook —often have hypnotic or sleep-inducing effects. Disturbed by the vagueness of many legal words, some of our profession

part, the opposition to such survival apparently owed much to the erstwhile criminal element of "personal" torts,[9] an element not present in contract claims. Perhaps that partly explains the fact that, generally, quasi-contractual claims do not expire with the claimant or the claimee.[10] At any rate since the non-survival rule is explicable historically only, not rationally, it would seem that, where no precedent otherwise requires, the rule should not be extended beyond the realm of torts.

Attempts to fit all the varieties of claims into neat categories, usable for all purposes, have never been satisfactory. Even the crudest of such attempts have never sought to shove into the category of torts all claims that are not contractual; for almost every purpose, it is granted that quasi-contractual ("as if" contractual) claims are not to be classified as torts, and that many claims arising from legal obligations imposed without regard to the intention of the obligated persons are quasi-contractual. Claims based on status seem clearly to be of that sort. To be sure, "status" is an ambiguous, leaky word.[11] Some status claims are partly contractual, partly not. This appears when one considers that frequently a contract itself creates a sort of status,[12] since it often gives birth to obligations, legally imposed by the courts, for reasons of policy, which the parties to the contract did not intend or contemplate,[13] so that many so-called contractual obligations may be viewed as to some extent quasi-contractual.[14] Here we come upon something like an unrecognized pun,

seek greater precision by resorting to the high-sounding but often meaningless vocabulary of the more unimaginative among the so-called social scientists. For criticism, see Orwell, Politics and Language. "Here," he writes, "is a well known verse from Ecclesiastes: 'I returned, and saw under the sun, that the race is neither to the swift, nor the battle to the strong, neither yet bread to the wise, nor yet riches to men of understanding, nor yet favor to men of skill; but time and chance happeneth to them all.' Here it is in modern English: 'Objective consideration of contemporary phenomena compels the conclusion that success or failure in competitive activities exhibits no tendency to be commensurate with innate capacity, but that a considerable measure of the unpredictable must invariably be taken into account.'" Rogers, Notes On The Language of Politics, 64 Pol.Sc.Q. (1949) 481, quotes the following samples of sociological jargon: "Orientation to particular situations is only partially determined by institutional norms even within the realm where this is intrinsically possible." "Fundamental psychological processes and reaction patterns are involved in types of deviance from an established set of institutional roles and definitions of the situations which lead to structural innovation." "Institutions are the patterns which define the essentials of the legitimately expected behavior of persons insofar as they perform structurally important roles in the social system." Rogers remarks, "A distinguished sociologist, Louis Wirth, has said: 'The findings of social science are sometimes regarded as elaborate statements of what everybody knows in language that nobody can understand.' Mr. Wirth might have added that the reader frequently is unaware that what is being said is something that he already knows." See also Ruby, Logic (1950) 31; Trilling, The Liberal Imagination (1950) 285.

9. Prosser, loc. cit. 950–951; Holdsworth, loc. cit. 331–332; Winfield, loc. cit. 241–242.

10. See note 29 infra.

11. Maine's famous aphorism—Ancient Law (3d Am. ed.) 163–165—has led to much misunderstanding and unjustified criticism. See U. S. v. Forness, 2 Cir., 125 F.2d 928, 936 note 25. See also as to the ambiguity of "status," Paton, Jurisprudence (1946) § 708; Seagle, The Quest For Law (1941) Chap. 17.

12. Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978, 990–991 and notes 42 and 43; U. S. v. Forness, 2 Cir., 125 F.2d 928, 936 note 25; and authorities there cited; Parev Products Co. v. I. Rokeach & Sons, 2 Cir., 124 F.2d 140, 149; Beidler & Bookmyer v. Universal Ins. Co., 2 Cir., 134 F.2d 828, 830–831.

That the feudal status relations were bottomed on contract, see U. S. v. Forness, 2 Cir., 125 F.2d 928, 936 note 25.

13. See cases cited in the preceding footnote; see also Stone, Equitable Conversion By Contract, 13 Col.L.Rev. (1913) 369, 371.

14. See discussion (showing the puzzlement of many writers) in Martin v.

and should beware of "the flatulencies that gather round the unacknowledged puns of language."[15]

With that caution in mind, it is important to perceive that the right to maintenance and cure lies on the borderline between "contract" and "quasi-contract": (1) It arises because there is a contract. More than a century ago, Mr. Justice Story, singularly wise in matters maritime, said of this right that it is "a part of the contract for wages, and is a material ingredient in the compensation for the labor and services of the seamen";[16] the Supreme Court more recently quoted that statement with approval.[17] (2) On the other hand, the Court has said that the right is "implied in law as a contractual obligation," i.e., is quasi-contractual;[18] and, noting that the right developed long before modern notions of contract,[19] the Court currently emphasizes its status (or "relational") character.[20] Certainly such a right does not sound in tort; even more certainly, it never was and is not now founded upon a tort for "personal" injury.[21]

In Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368, a seaman fell ill without fault on the part of the ship, and later died. His administrator sued under the Jones Act, alleging that his death resulted from the ship's failure to afford him proper medical care. No claim was made for the expense of accrued maintenance and cure. This court—2 Cir., 52 F.2d 22—held that the obligation to provide cure was contractual, and that non-performance of a contractual obligation could not be deemed "negligence" within the meaning of the Jones Act, which provides that the seaman's personal representative may recover for "injury or death" of the seaman resulting from "negligence." The Supreme Court reversed, holding that the suit could be maintained if, on the facts, there was a causal relation between (a) the negligence in failing to furnish cure and (b) the death. The Court said that a failure to afford cure might yield two rights: (1) A right to the expense of the cure, regardless of negligence;[22] this right, the Court indicated in a dictum,

Campanaro, 2 Cir., 156 F.2d 127, 130 note 5; Lenhoff, Optional Terms and Required Terms in the Law of Contracts, 45 Mich.L.Rev. (1946) 39.

15. See Williams, Language and The Law, 61 L.Q.Rev. (1945) 179. He also says (191); "The upshot is that the words we use, though they have a central core of meaning that is relatively fixed, are of doubtful application to a considerable number of marginal cases. In general, we try in our language to sharpen our distinctions beyond what is warranted by the facts of the case. It is a necessary feature of language that we should have to make this effort, and thus it is inevitable that our linguistic distinctions should constantly break down."

16. Harden v. Gordon, 11 F.Cas. pages 480, 481, No. 6,047. See also The Osceola, 189 U.S. 158, 172, 23 S.Ct. 483, 47 L.Ed. 760.

17. The Osceola, 189 U.S. 158, 172, 23 S.Ct. 483, 47 L.Ed. 760; Pacific S. S. Co. v. Peterson, 278 U.S. 130, 137, 49 S.Ct. 75, 73 L.Ed. 220.

18. Pacific Steamship Co. v. Peterson, 278 U.S. 130, 138, 49 S.Ct. 75, 77, 73 L.Ed. 220. The Court coupled the right with the right to wages and said of the two that they are "implied in law."

See also McDonald v. Cape Cod Trawling Corp., D.C.Mass., 71 F.Supp. 888, 891.

19. O'Donnell v. Great Lakes Co., 318 U.S. 36, 42, 63 S.Ct. 488, 87 L.Ed. 596.

20. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 91, 66 S.Ct. 872, 90 L.Ed. 1099; O'Donnell v. Great Lakes Co., 318 U.S. 36, 42, 63 S.Ct. 488, 87 L.Ed. 596; Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 87 L.Ed. 1107; Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 373, 53 S.Ct. 173, 77 L.Ed. 368.

21. In Pacific Steamship Co. v. Peterson, 278 U.S. 130, 138, 49 S.Ct. 75, 77, 73 L.Ed. 220, the Court said: "In short, the right to maintenance, cure and wages, implied in law as a contractual obligation arising out of the nature of the employment, is independent of the right to indemnity or compensatory damages for an injury caused by negligence; and these two rights are consistent and cumulative."

See also McDonald v. Cape Cod Trawling Corp., D.C.Mass., 71 F.Supp. 888, 891.

22. McDonald v. Cape Cod Trawling Corp., 71 F.Supp. 888, 891, citing the Cortes

would survive death without the aid of a statute. (2) A right, if the breach was negligent, for ensuing harm to the seaman's health; this second right does not survive except by a statute, such as the Jones Act,[23] because it is on account of something in the nature of a "personal" tort (*i.e.,* what is sometimes called a "tortious breach of contract.")[24]

Here the asserted right is the first kind, *i.e.,* for the expense of accrued maintenance and cure, a right which had fully matured

case, Judge Wyzanski said that "the cause of action for maintenance and cure * * * is founded on a maritime quasi-contract * * * and is not an action for damages for personal injury, * * *."

23. The Court said, 287 U.S. at 370–371, 373–375, 53 S.Ct. at pages 174, 175, 77 L.Ed. 368: "By the general maritime law, a seaman is without a remedy against the ship or her owners for injuries to his person, suffered in the line of service, with two exceptions only. A remedy is his if the injury has been suffered as a consequence of the unseaworthiness of the ship or a defect in her equipment. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171; Pacific S. S. Co. v. Peterson, 278 U.S. 130, 134, 49 S.Ct. 75, 73 L.Ed. 220. A remedy is his also if the injury has been suffered through breach of the duty to provide him with 'maintenance and cure.' The duty to make such provision is imposed by the law itself as one annexed to the employment. The Osceola, supra. Contractual it is in the sense that it has its source in a relation which is contractual in origin, but, given the relation, no agreement is competent to abrogate the incident. If the failure to give maintenance or cure has caused or aggravated an illness, the seaman has his right of action for the injury thus done to him; the recovery in such circumstances including not only necessary expenses, but also compensation for the hurt. The Iroquois, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955. On the other hand, the remedy for the injury ends with his death in the absence of a statute continuing it or giving it to another for the use of wife or kin. * * * The failure to provide maintenance or cure may be a personal injury or something else according to the consequences. If the seaman has been able to procure his maintenance and cure out of his own or his friends' money, his remedy is for the outlay, but personal injury there is none. If the default of the vessel and its officers has impaired his bodily or mental health, the damage to mind or body is none the less a personal injury because he may be free at his election to plead it in a different

count. Cf. Pacific S. S. Co. v. Peterson, supra, 278 U.S. at pp. 137, 138, 49 S.Ct. 75, 73 L.Ed. 220. Nor is liability escaped by appeal to the distinction between acts of omission on the one hand and those of commission on the other. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 167, 168, 159 N.E. 896, 62 A.L.R. 1199. A division is sometimes drawn between the termination of a relation at a time when it is still executory or future, and its termination when performance has gone forward to such a point that abandonment of duty becomes an active agency of harm. Moch Co. v. Rensselaer Co., supra. The respondent is not helped though its treatment of the seaman be subjected to that test. Here performance was begun when the vessel started on her voyage with Santiago aboard and with care and cure cut off from him unless furnished by officers or crew. From that time forth withdrawal was impossible and abandonment a tort. Given a relation involving in its existence a duty of care irrespective of a contract, a tort may result as well from acts of omission as of commission in the fulfilment of the duty thus recognized by law. * * * While the seaman was still alive, his cause of action for personal injury created by the statute may have overlapped his cause of action for breach of the maritime duty of maintenance and cure, just as it may have overlapped his cause of action for injury caused through an unseaworthy ship. Pacific Co. v. Peterson, supra, 278 U.S. at p. 138, 49 S.Ct. 75, 73 L.Ed. 220; Baltimore S. S. Co. v. Phillips, 274 U.S. 316, 321, 324, 47 S.Ct. 600, 71 L.Ed. 1069. In such circumstances it was his privilege, in so far as the causes of action covered the same ground, to sue indifferently on any one of them. The overlapping is no reason for denying to the words of the statute the breadth of meaning and operation that would normally belong to them, at all events when a consequence of the denial is to withhold any remedy whatever from dependent next of kin. A double remedy during life is not without a rational office if the effect of the duplication is to carry the remedy forward for others after death."

24. See, e. g., Forrester v. Southern Pacific Co., 36 Nev. 247, 134 P. 753, 759, 136

while the seaman lived, and which could then have at once been precisely determined in money terms. Surely (as the defendant itself vigorously asserts in its brief) this right did not grow out of a tort or a "tortious breach of contract." For that reason we think inapplicable the New York statute[25] keeping alive actions for "personal" torts, despite Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903,[26] and although we are aware of the present rather anemic condition of the doctrine of Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086.[27] For the same reason, we regard as irrelevant the non-survival (other than by statute) of a claim for a seaman's wrongful death,[28] since such a claim is for a tort or a "tortious breach of contract."

 We have here, then, a wholly non-tort obligation, "relational" or status in nature, and thus quasi-contractual but emerging from a contract, an obligation said to resemble closely the equitable duty of a trustee to his *cestui* or a guardian to his ward.[29] As already noted, many quasi-contractual obligations survive,[30] including those derived from status.[31] So, too, do many claims for breaches of equitable duties.[32]

Accordingly, believing that, although the

---

P. 705, 48 L.R.A.,N.S., 1; Kelley v. Union Pac. Railway Co., 16 Colo. 455, 458, 27 P. 1058; Evans, A Comparative Study of Statutory Survival of Tort Claims For and Against Executors and Administrators, 29 Mich.L.Rev. (1931) 969, 977, 978; Note, 13 Cornell L.Q. (1928) 596, 599 and note 28.

The relation between physician and patient is ordinarily contractual; yet an action for malpractice is usually considered one for negligence, so that the patient's contributory negligence is a defense.

25. Decedent Estate Law § 119.

26. Cf. Nordquist v. United States Trust Co. of New York, 2 Cir., 188 F.2d 776. See also The Hamilton, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264.

27. See Standard Dredging Corp. v. Murphy, 319 U.S. 306, 63 S.Ct. 1067, 87 L.Ed. 1416; Jarka Corp. v. Hellenic Lines, 2 Cir., 182 F.2d 916, 919.

28. The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686.

The Court based its decision in The Harrisburg on the ground that the same rule should govern in admiralty and common law; see 119 U.S. at 213, 7 S.Ct. 140, 30 L.Ed. 358.

The opinion in The Harrisburg discloses the previous unwillingness of many lower courts to apply the death maxim to wrongful death actions in admiralty. Those courts said that the death maxim was unjust, not in keeping with the spirit of justice and equity which had always imbued the admiralty jurisdiction.

The ancient opposition to such actions at common law is more readily explicable than the opposition to the survival of actions for "personal" injuries suffered before death: It seems to have been felt that, as the asserted claim did not exist before death, and the wrong could come into being only at the very moment when the dead man ceased to exist, he never possessed any claim which passed to his estate; in other words, the claim was regarded as too ghost-like.

29. Harden v. Gordon, 11 Fed.Cas. at page 485, No. 6,047; Brown v. Lull, 4 Fed. Cas. 407, 409, 410, No. 2,018; Garett v. Moore-McCormack Co., 317 U.S. 239, 247, 63 S.Ct. 246, 87 L.Ed. 239; Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 344; cf. The Osceola, 189 U.S. 158, 172, 23 S.Ct. 483, 47 L.Ed. 760; Petition of Moran Transp. Corp., 2 Cir., 185 F.2d 386, 387, 389 note 6.

30. Restatement of Restitution, § 5, Comment b; see also pp. 523, 524; Patton v. Brady, 184 U.S. 608, 615, 22 S.Ct. 493, 46 L.Ed. 713; Lawyers Mortgage Co. v. Bowers, 2 Cir., 50 F.2d 104; Anderson v. Metropolitan Stock Exchange, 191 Mass. 117, 77 N.E. 706, 707.

31. See, e. g., Van Ness v. Ransom, 215 N.Y. 557, 560, 109 N.E. 593, L.R.A. 1916B, 852.

32. Illinois Central R. R. Co. v. Turrill, 110 U.S. 301, 303–304, 4 S.Ct. 5, 28 L.Ed. 154; Brown v. Hilleary, 133 Or. 26, 286 P. 593, 594; Allen v. Frawley, 106 Wis. 638, 82 N.W. 593, 594.

See Sullivan v. Associated Billposters & Distributors, 2 Cir., 6 F.2d 1001, 1003, 42 A.L.R. 503, as to the general refusal to recognize the death maxim in equity.

death maxim is not yet dead, it should not be given enlarged potency, we hold—on the bases of history, analytic classification, analogy, common sense, reason, and justice —that the claim here did not follow the seaman into his grave.

Affirmed.