**RICE v. SIOUX CITY MEMORIAL PARK CEMETERY, Inc. et al.**

Civ. No. 666.

United States District Court
N. D. Iowa, W. D.

Feb. 4, 1952.

Neil R. McCluhan, Winnebago, Neb., Lowell Kindig, Robert Beebe, Sioux City, Iowa, for plaintiff.

H. C. Harper, of Harper, Gleysteen & Nelson, Henry C. Shull, and Jesse E. Marshall, of Shull & Marshall, all of Sioux City, Iowa, for defendants.

GRAVEN, District Judge.

The question here presented for consideration is the question as to whether the controversy between the parties is one as to which this Court has jurisdiction.

On December 12th, 1951, the plaintiff commenced this action in the District Court of Iowa in and for Woodbury County. The plaintiff's complaint (petition under state practice), with formal parts omitted, was as follows:

Comes now the plaintiff, Evelyn Rice, and in this, her cause of action against the defendants, states to the Court that:

Count I.

Par. 1. She is a resident of Winnebago, Nebraska, and the defendant, Sioux City Memorial Park Cemetery, Incorporated, is a corporation incorporated under the laws of the State of Iowa, with its principal place of business in Woodbury County, Iowa, and that the defendants, F. K. Lytle and J. M. Gunnell, are officers and managing directors of said corporation and are residents of Sioux City, Woodbury County, Iowa.

Par. 2. On or about the 17th day of August, A. D. 1951, the plaintiff entered into a written contract, hereto attached and marked Exhibit "A", and by this reference made a part hereof, for the purchase of three cemetery lots belonging to the Sioux City Memorial Park Cemetery, Incorporated, a corporation, one of which lots was to be used for the burial of her husband, Sergeant John Rice, and the defendant corporation, through its authorized representatives, was so advised, and in part performance of this contract the plaintiff paid the sum of $100 to the defendant corporation.

Par. 3. Said Sergeant John Rice was a Sergeant in the United States Army and had been killed in combat while on active duty with the United States Army in Korea, and his body, at the time the contract was entered into, was being returned to the United States for burial.

Par. 4. On or about the 28th day of August, A. D. 1951, pursuant to arrangements made between the plaintiff and the defendant cemetery, a burial ceremony was held at the cemetery maintained by the corporation on the outskirts of Sioux City, Iowa, for final interment of the body.

Par. 5. The services were attended by the plaintiff, members of her family, members of her deceased husband's family, representatives of the United States Army, a representation of the American Legion Post of Winnebago, Nebraska, and friends of the plaintiff and the decedent. The burial was likewise supervised by representatives of the Sioux City Memorial Park Cemetery, Incorporated, who were present throughout all of the ceremony.

Par. 6. Preceding the ceremony, the funeral procession was met at the entrance of the cemetery and the said procession was escorted to the gravesite by representatives of the defendant corporation and others, and the proceedings were thereupon carried out without objection or interference by the defendant corporation.

Par. 7. Upon the completion of the burial ceremony and after the sounding of Taps, the plaintiff and other interested persons left the cemetery with the knowledge and belief that the body was to be lowered into the grave and the grave covered.

Par. 8. The plaintiff left the premises of the defendant corporation at about 11:30 A. M. on August 28, 1951 and returned to her home near Winnebago, Nebraska. The defendant corporation then notified the undertaking parlor having charge of the arrangements that it would not permit the body to be placed in the ground and that other or different arrangements would have to be made for the interment of said body. Thereafter, and at approximately 4:00 o'clock P. M. of the same day, the plaintiff was advised and informed that after the completion of the funeral ceremony the defendant corporation had refused to lower the body of her deceased husband into the ground and had wrongfully and without plaintiff's permission caused said body to be removed from the gravesite and transported to various locations in and near the cemetery premises.

Par. 9. At the time and place of receiving this information, the plaintiff was in a highly nervous and distraught condition because of the emotional factors involved in the burial of her deceased husband and the care and maintenance of their three minor children, ages six, three, and two. At this point she was advised that the refusal to bury her soldier husband was because of the fact that he had Indian blood in his veins and that he was not a Caucasian, and that the body would have to be claimed by her for further disposition.

Par. 10. Upon being advised of this refusal on the part of the defendant corporation to lower the body into the grave, the plaintiff returned to Winnebago and there visited with representatives of the defendant corporation, and at said time and place the defendant corporation tendered the plaintiff an affidavit, a copy of which is hereto attached and marked Exhibit "B," and by this reference made a part hereof, which it had prepared and requested that she sign said affidavit, but the plaintiff refused to sign said affidavit because it stated, among other things, that her deceased husband was a member of the Caucasian race, and she had been advised by the representatives of the defendant corporation that their refusal to permit the burial of her deceased husband was based upon the fact that he, being an Indian, was not a member of the Caucasian race.

Par. 11. Following the refusal of the defendant corporation to permit Sergeant John Rice's body to be buried in the defendant corporation cemetery, and while the plaintiff attempted to make other arrangements for the interment of her husband's body, the President of the United States intervened and arranged for the burial of the plaintiff's husband's body in the Arlington National Cemetery, at Arlington, Virginia, and arrangements and interment were finally made in said Cemetery.

Par. 12. The acts of the defendant caused her great mental distress, humiliation, emotional fatigue, and nervous exhaustion, which condition was subsequently aggravated by the acts of the defendant in issuing statements and publications causing the plaintiff to be held up to ridicule and humiliation because of her marriage to the defendant, and the fact that part of his ancestors were of Indian blood and descent.

Par. 13. One of said publications which was given general circulation is hereto attached and marked Exhibit "C," and by this reference made a part hereof, makes numerous false and misleading statements all to the damage of the plaintiff.

Par. 14. The general tenor of said publication, Exhibit "C," was to hold the plaintiff and her deceased husband to public ridicule and contempt and to continue and extend the humiliation and mental suffering caused the plaintiff by the acts of the defendants.

Par. 15. The acts of the defendants in refusing to permit the burial of the body of the plaintiff's deceased husband was in direct violation of the plaintiff's rights and of the Fourteenth Amendment to the Con-

stitution of the United States, and was in further violation of Section 1, Article 1 and Section 6, Article 1 of the Constitution of the State of Iowa, I.C.A.

Par. 16. The acts of the defendants, and each of them, hereinabove set out and complained of, were willful and malicious and were the direct and proximate cause of the damage herein complained of and suffered by the plaintiff.

Par. 17. The plaintiff was herself free from any negligence contributing in any manner or degree to the damage herein complained of.

Par. 18. As a result of the willful and malicious conduct of the defendants hereinabove set out, the plaintiff has been damaged because of humiliation, nervous upset, and being held up to public ridicule under the circumstances in the sum of $20,000.

Par. 19. In addition thereto, the acts of the defendants being willful and malicious and being done with the knowledge that said illegal conduct on their part would harm the plaintiff and subject her to humility and nervous upset, plaintiff is entitled to recover punitive or exemplary damages in the sum of $40,000.

Par. 20. This cause of action is the property of this plaintiff and demand has been made upon the defendants and they have failed and refused to pay said damages, or any part thereof.

Wherefore, plaintiff prays that she be given judgment in the sum of $60,000, together with interest thereon at the rate of 5 per cent. per annum from the date of judgment, and for the costs of this action.

## Count II.

Comes now the plaintiff and, for this, her separate and different cause of action against the defendants, and each of them, respectfully states to the Court:

All of the allegations in Paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14 of Count I, of this petition are by this reference made a part hereof without repetition.

Par. 15. That part of the written contract heretofore referred to as Exhibit "A" attached to this petition which reads: "This agreement is assignable only with the consent of seller, and burial privileges accrue only to members of the caucasian race * * *" is an illegal and unenforcible provision and violates the Fourth and Fourteenth Amendments to the Constitution of the United States and Section 1, Article 1, and Section 6, Article 1 of the Constitution of the State of Iowa.

Par. 16. Even though it might be held that said provision in the contract, Exhibit "A," is constitutional, a fair interpretation of said clause in the contract, Exhibit "A," gives this plaintiff the right to bury anyone of her own choosing in the cemetery lots which she was purchasing since the plaintiff is herself a member of the Caucasian race and it was, therefore, her privilege to bury anyone not a member of the Caucasian race in her lots.

Par. 17. This plaintiff, having entered into said written agreement with the defendant corporation, and having made partial performance of her obligations by paying the sum of $100 to the defendant corporation—which was all that was required to be paid at that time—was entitled to the full and complete performance of said contract on the part of the defendants.

Par. 18. The defendants' conduct hereinbefore alleged amounted to a breach of said written agreement.

Par. 19. The breach of said agreement on the part of the defendants was willful and malicious and done with full knowledge that it would result in the damage herein complained of.

Par. 20. As a direct result of said breach of contract, and without any fault on the part of the plaintiff, the plaintiff has been damaged because of humiliation, being held up to public ridicule and contempt, and mental pain and suffering and nervous upset in the sum of $20,000.

Par. 21. In addition thereto, the conduct of the defendants in violating the terms of said written agreement having been committed wilfully, maliciously, and with the knowledge that said conduct would harm and grieve the plaintiff, the plaintiff is entitled to recover punitive or exemplary damages in the sum of $40,000.

Par. 22. This cause of action is the property of this plaintiff, and said damages, or any part thereof, have not been paid by the defendants, even though demand was made upon them.

Wherefore, plaintiff prays that she be given judgment in the sum of $60,000, together with interest thereon at the rate of 5 per cent. per annum from the 28th day of August, 1951, the date of the breach of said contract, and for the costs of this action.

## Count III.

Comes now the plaintiff and in this, her separate and inconsistent cause of action against the defendants, and each of them, respectfully states to the Court:

She incorporates in their entirety by this reference Paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of Count I of this petition.

Par. 16. The plaintiff's deceased husband, Sergeant John Rice, had 11/16 Winnebago Indian blood and 5/16 white blood in his veins and was, in truth and in fact, a member of the Caucasian race.

Par. 17. Because he was a member of the Caucasian race, this plaintiff, by the terms of said written agreement Exhibit "A," was entitled to have her deceased husband buried in the defendants' cemetery.

Par. 18. The defendants by their conduct breached said written agreement, Exhibit "A," and were wrong in concluding that the plaintiff's deceased husband was not a member of the Caucasian race and did, therefore, wrongfully violate the terms of said written agreement.

Par. 19. The defendants' conduct under the circumstances was willful and malicious, and their breach of said contract was the direct cause of the great humility and mental pain and suffering endured by the plaintiff and resulted further in her being held up to public ridicule and contempt and, as a result thereof, she has been damaged in the sum of $20,000.

Par. 20. The breach of said contract by the defendants under the circumstances hereinbefore alleged having been willful, wrongful, and malicious, and done with the knowledge that the plaintiff would suffer the damage herein complained of, the plaintiff is entitled to recover punitive or exemplary damages in the sum of $40,000.

Par. 21. This cause of action is the property of the plaintiff, and no part of the damage herein complained of has been paid to her, although demand has been made.

Wherefore, plaintiff prays that she be given judgment in the sum of $60,000, together with interest thereon at the rate of 5 per cent. per annum from the 28th day of August, 1951, the date of the breach of the contract, and for the costs of this action.

On December 15th, 1951, the defendants removed the case to this Court. The Court on its own motion ordered that a hearing be had on the question as to whether the case was one as to which this Court has jurisdiction. The parties submitted written briefs at the hearing and arguments were made.

■■ As stated in Molina v. Sovereign Camp, W.O.W., D.C.Neb. 1947, 6 F.R.D. 385, 396: "* * * it is the duty of a federal court, at every stage of proceedings pending before it, to examine into the question as to whether it has jurisdiction over the subject matter and parties to such proceedings, and, whenever it becomes satisfied that it lacks such jurisdiction, it must immediately take cognizance thereof and refuse to proceed further, regardless of the absence of objection by any of the parties, and even if all the parties are willing to waive such objection."

Cf., St. Paul Mercury Indemnity Co. v. Red Cab Co., 1938, 303 U.S. 283, 287–288, 58 S.Ct. 586, 82 L.Ed. 845; Yocum v. Parker, 8 Cir., 1904, 130 F. 770, 771; Bank of Arapahoe v. David Bradley & Co., 8 Cir., 1896, 72 F. 867, 872; Annotation, 12 A.L.R.2d 5, 12–15, citing many cases. The United States District Courts are courts of limited jurisdiction; thus the presumption is against jurisdiction, and jurisdiction must affirmatively appear. See, e.g., Le Mieux Bros. v. Tremont Lumber Co., 5 Cir., 1944, 140 F.2d 387; Young v. Main, 8 Cir., 1934, 72 F.2d 640; Yocum v. Parker, supra. The removal jurisdiction of United States District Courts is statutory, and it

has been held that in the removal statutes there is manifest a Congressional purpose to limit removal jurisdiction strictly; Shamrock Oil & Gas Corp. v. Sheets, 1941, 313 U.S. 100, 108–109, 61 S.Ct. 868, 872, 85 L.Ed. 1214. In John Hancock Mut. Life Ins. Co. v. United Office & Professional Workers of America, D.C.N.J. 1950, 93 F.Supp. 296, after quoting from the Shamrock case, the Court states, 93 F.Supp. at page 302: "There is no suggestion that the passage of the new legislation affecting removal proceedings, 28 U.S.C.A., § 1441 et seq., was intended to demolish the structure of that policy or to substantively extend the jurisdiction of the federal courts. It is likewise still the burden of the petitioner for removal to establish his right to remove which must be construed strictly and the petition should not be granted if there is doubt as to the right of removal in the first instance."

Again, 93 F.Supp. on p. 302, the Court states: "All doubt should therefore be resolved in favor of remand."

The parties have stipulated that the cemetery in question was and is a private cemetery. Neither the State of Iowa nor any of its agencies had or has any connection with the ownership or operation of the cemetery in question or with the transaction in question. The same is true with respect to the United States and its agencies.

Paragraphs (a), (b), and (c) of 28 U.S.C.A. § 1441, provide as follows:

"(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

"(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

"(c) Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction."

While diversity of citizenship exists between the plaintiffs and all of the defendants and over $3,000 is involved, yet, since the defendants are citizens of the State of Iowa, they could not, under the second sentence of Sec. 1441(b), remove the case on the ground of diversity of citizenship.

■ It has been held that federal courts do not obtain jurisdiction of a case merely because one of the litigants is an Indian. Paul v. Chilsoquie. C.C. Ind., 1895, 70 F. 401, 403; Deere v. St. Lawrence River Power Co., 2 Cir., 1929, 32 F.2d 550, 551. A fortiori, the fact that plaintiff's deceased husband was an Indian would not, of itself, confer jurisdiction on this Court in the present case.

It is the claim of the defendants that this Court would have had original jurisdiction under the provisions of 28 U.S.C.A. § 1331, and that therefore this action was properly removed to this Court. That section provides as follows: "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States."

Under the provisions of that section federal district courts have jurisdiction if two elements exist: (1) that the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and (2) that the matter in controversy arises under the Constitution, laws or treaties of the United States. As heretofore noted, the requisite jurisdictional amount is in

controversy herein. Thus the question to be considered is whether the controversy is one which "arises under the Constitution, laws, or treaties of the United States."

The plaintiff in her complaint makes no claim under the Civil Rights Act, 8 U.S.C.A. § 41 et seq. Thus 28 U.S.C.A., § 1343, relating to original jurisdiction of actions to redress the deprivation of civil rights, does not confer jurisdiction on this Court. No claim is made that this Court has removal jurisdiction of the present case under 28 U.S.C.A. § 1443, relating to actions against a defendant who is asserting civil rights. None of the parties claim that any federal statute or treaty has any sufficiently direct bearing on the controversy to confer jurisdiction upon this Court. It is the claim of the defendants that the matter in controversy arises under the Constitution of the United States. ·

■ In the well known case of Gully v. First National Bank, 1936, 299 U. S. 109, 57 S.Ct. 96, 97, 81 L.Ed. 70, one national banking association transferred its assets to another national bank under a contract whereby the debts and liabilities of the former were assumed by the latter. Among the debts and liabilities assumed were claims for taxes due the State Collector of Taxes. That Collector brought suit against the transferee bank for such taxes. The transferee bank removed the case to federal court on the ground that the suit was one arising "under the Constitution or laws of the United States". The defendant transferee bank claimed that, since the power to levy a tax upon the shares of national banks had its origin in the provisions of a federal statute, the State Collector counted on that statute in suing for the tax. The United States Supreme Court held that the suit was not one arising under the laws of the United States. Justice Cardozo, speaking for a unanimous Court, stated, 299 U. S. at 114, 57 S.Ct. at page 98, 81 L.Ed. 70. "The suit is built upon a contract which in point of obligation has its genesis in the law of Mississippi."

Justice Cardozo, 299 U. S.· at 115, 57 S.Ct. at page 98, 81 L.Ed. 70, referred to the "obligation of the contract" as being

a "creation of the state" and stated: "Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit."

The defendants, citing the Gully case, contend that a controversy arises under the Constitution if the claim will be supported by one construction of the Constitution and defeated by another. It should be noted that such test was merely one of a list of several criteria set forth in the Gully case, all of which must be met before a matter can be considered to arise under the Constitution so as to confer federal court jurisdiction. While there is some language in Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939, 13 A.L.R.2d 383, that might be construed as not in harmony with the Gully case, yet, in Bell v. Hood, the United States Supreme Court cites and purports to follow the Gully case. But cf., Strachman v. Palmer, D.C.Mass.1949, 82 F.Supp. 161, reversed in part, 1 Cir., 1949, 177 F.2d 427, 12 A.L.R.2d 687; Massachusetts Universalist Convention v. Hildreth & Rogers Co., D.C.Mass.1949, 87 F.Supp. 822, affirmed 1 Cir., 1950, 183 F.2d 497; State of Georgia v. Wenger, D.C.Ill.1950, 94 F.Supp. 976, affirmed, 7 Cir., 1951, 187 F.2d 285; Stella v. Kaiser, D.C.N.Y.1948, 82 F.Supp. 301; McCartney v. State of West Virginia, 4 Cir., 1946, 156 F.2d 739. See also, Larson v. Domestic & Foreign Commerce Corp., 1948, 337 U.S. 682, 690, fn. 10, 69 S.Ct. 1457, 93 L.Ed. 1628.

The plaintiff's complaint will next be considered. That complaint is in three counts. In Count I, the plaintiff asks damages in the sum of $60,000 with interest from the date of judgment; in Count II she asks damages in the sum of $60,000 with interest from August 28th, 1951; and in Count III she asks damages in the sum of $60,000 with interest from August 28th, 1951. The defendants in their petition for removal assert that the plaintiff is asking damages in the sum of $180,000. The claims of damages are stated similarly and in the same amounts in all three counts. The plaintiff describes Count III as being a "separate and inconsistent" cause of action. The complaint might be read as being a claim for $180,000 upon all three

counts, or as a claim for $120,000 based upon two counts, or as a claim for $60,000 based upon the idea of one general wrong, with recovery sought upon any one of several different theories.

Count I of the complaint, although it recites that plaintiff and the defendant corporation entered into a written contract for the purchase of three cemetery lots, does not appear to be an action for breach of contract. Count I alleges damages proximately resulting from the alleged wrongful and malicious acts of the defendants in refusing to bury plaintiff's deceased husband and in publishing the statement identified herein as Exhibit C, set out supra. It contains an allegation of plaintiff's freedom from negligence. In the case of Peitzman v. City of Illmo, 1944, 141 F.2d 956, 961, the United States Court of Appeals for the Eighth Circuit stated: "Conduct that is merely a breach of contract is, of course, not a tort. However, a contract may establish a relationship and failure to exercise proper care or tortious and intentional wrong in performing it may give rise to a tort liability which is not defeated because there was a contract."

In the case of Smith v. Weber, 1944, 70 S.D. 232, 16 N.W.2d 537, the lessee of an apartment sought to recover damages from his landlord. It was the claim of the lessee that the landlord had wilfully, maliciously, and intentionally removed him from the leased apartment by the burning of garbage and rubbish in the furnace that supplied the heat for the apartment. The parties were in controversy as to the nature of the action. The South Dakota Supreme Court stated 16 N.W.2d at 539: "It may be conceded that tort usually signifies a breach of legal duty independent of contract. But such breach of duty may arise out of a relation or state of facts created by contract. * * * While the matters complained of by plaintiff had their origin in a contract, the gist of the action is for alleged wrongful and tortious acts of defendant." See also Sperbeck v. A. L. Burbank & Co., 2 Cir., 1951, 190 F.2d 449, 451.

Thus, it appears that in Count I the plaintiff seeks to recover damages for wrongful and tortious conduct of the defendants, and that it sounds in tort. However, except for the contract the relation of the defendants to the plaintiff would not have been such that their refusal to bury plaintiff's deceased husband could in any way be considered wrongful or tortious.

The claim of the plaintiff in Count II is based upon two different theories. In that count she asserts that under the contract, she being a member of the Caucasian race, had a right to bury anyone in the lot, even though the one buried was not a member of the Caucasian race. She further claims, in substance, that if the contract be not so construed, then it should be held that the provision in the contract restricting burial privileges to Caucasians is void as violative of the Fourth and Fourteenth Amendments to the Constitution of the United States and Sections 1 and 6 of Article I of the Constitution of Iowa. In oral argument counsel for the plaintiff stated that the reference in that count to the Fourth Amendment to the Constitution of the United States was the result of clerical error and that the plaintiff intended to refer to the Fifth Amendment.

The plaintiff in Count III asks that it be held that her deceased husband was a member of the Caucasian race.

The allegations made in the several counts and matters incident to such counts would be indicative or tend to be indicative of the nature of the rights asserted by the plaintiff. In Count III the plaintiff seeks to recover damages for a breach of contract. This count is bottomed upon the theory that the deceased was a member of the Caucasian race. The plaintiff in this count, in effect, sues upon the contract as it is and the validity of the racially restrictive clause is not brought into question. In this count the plaintiff, in reality, seeks to recover damages for a breach of contract under the applicable state law. The determination of the question as to whether the plaintiff's deceased husband was or was not a member of the Caucasian race would not and does not require any reference to federal law. The damages sought to be recovered by the plaintiff in this count

might have been intended by her to be a duplication of the damages claimed by her in either one or both of the other counts.

■■ In Count II the plaintiff asserts that under the provisions of the contract she, being a member of the Caucasian race, had a right to bury anyone of her choosing in the lot, whether or not the one buried was a member of the Caucasian race. The plaintiff in this count seeks to recover damages for a breach of contract. The plaintiff in this portion of Count II, in effect, sues upon the contract as it is, and the validity of the racially restrictive clause is not brought into question. In this portion of Count II the plaintiff, in reality, seeks to recover damages for a breach of contract under the applicable state law. The determination of the question as to whether the plaintiff had or had not the asserted right of selection under the provisions of the contract does not require any reference to federal law. The plaintiff further in that count claims, apparently in the alternative, that if she did not have the claimed right of selection, that she nevertheless be allowed to recover damages for breach of the contract. This latter claim is based on the theory that the contract is to be considered as not containing the racially restrictive provision because the same is void under the Constitution of Iowa or the Constitution of the United States or both. The question as to whether the provision is in violation of the Constitution of Iowa is not a matter of federal court cognizance. Cf., Emmons v. Smitt, 6 Cir., 1945, 149 F.2d 869, 872, certiorari denied, 1945, 326 U. S. 746, 66 S.Ct. 59, 90 L.Ed. 446. If it should be held that the provision is void under the Constitution of Iowa, the question would not be reached as to its status under federal law. If the contract should be construed as not giving the plaintiff the claimed right of selection, and if it should be held that the provision was valid under state law, then it would be necessary to make reference to federal law. As heretofore noted, while Count I of the complaint sounds in tort, yet that claim has its origin in the claimed breach of contract by the defendants. It could be con-

sidered that it was the intention of the plaintiff that the damages sought by her under any of the counts were inclusive of the damages sought in the other counts.

Under Count III and under one theory of recovery in Count II, the claim of the defendants would be that the plaintiff's construction of the contract was not the proper construction. It would seem that in Count I and in her alternative theory in Count II, the pleading of the plaintiff is somewhat anticipatory in nature. She alleges that the cemetery corporation breached its contract with her, and she assumes that the defendants will plead the racially restrictive provision by way of defense. She anticipates such defense by pleading originally that the contract provision upon which they will rely is void under the State Constitution or Federal Constitution or both.

It would seem that the foundation of all of the plaintiff's theories of action is a claimed breach of the contract between her and the cemetery corporation. One theory of breach is that the cemetery corporation wrongfully refused to recognize her deceased husband as being a member of the Caucasian race. Another theory is that the cemetery corporation wrongfully refused to recognize her right of selection as to those who could be buried in the lot in question. Both of those theories, as heretofore noted, seek to recover for a breach of the contract as it is. Under another theory the plaintiff seeks to recover upon the contract with the racially restrictive provision eliminated by state law. Under another theory the plaintiff seeks to recover upon the contract with the racially restrictive provision eliminated by federal law. Under the provisions of Section 1441(c) of 28 U.S.C.A., if a separate and independent claim or cause of action which would be removable if sued upon alone is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed. Therefore, the fact that the plaintiff may have joined one or more non-removable claims would not prevent removal of the entire case if there were a separate and in-

dependent claim or cause of action which was properly removable.

The question, then, is whether, in the present case there is an independent claim or cause of action which would be removable because "the matter in controversy arises under the Constitution . . . of the United States." It is believed that the present case comes within the scope of the doctrine of the case of Gully v. First National Bank, supra. The contract here in question was a state-created obligation. The obligations of the parties under that contract had their "genesis" in the law of the State of Iowa. It is the view of the Court that there is considerable doubt as to whether there is an independent claim or cause of action which presents a controversy arising under the Constitution of the United States. As heretofore noted, it is the duty of a federal court in removal cases to remand such cases to the state court if there is doubt as to federal court jurisdiction.

The parties, in their briefs and in oral argument, referred to and discussed the cases of Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441; Dorsey v. Stuyvesant Town Corp., 1949, 299 N.Y. 512, 87 N.E.2d 541, 14 A.L.R.2d 133; Weiss v. Leaon, 1949, 359 Mo. 1054, 225 S.W.2d 127; and Gandolfo v. Hartman, C.C.Cal., 1892, 49 F. 181, 16 L.R.A. 277. Those cases did not involve the jurisdictional question here presented, and the parties do not claim that they did.

It is the holding of the Court that this case be remanded to the District Court of Iowa in and for Woodbury County.

### Exhibit "A"

"M No. 1335

"Sioux City Memorial Park Cemetery, Inc.

This Contract, Made at Sioux City, Iowa, on this 17 day of August, 1951, between the Sioux City Memorial Park Cemetery, Inc. (owners and developers of Sioux City Memorial Park), its successors and assigns, Party of the First Part (seller), and Mrs. Evelyn Rice, of Winnebago, Nebr., Party of the Second Part (purchaser), Witnesseth:

"That the said Party of the Second Part agrees to purchase from the said Party of the First Part the following: Right of Sepulchre in and to So. ½ (spaces 4–5 & 6) Lot 58 in Section Veterans, Sioux City Memorial Park, a burial ground with permanent care as hereinafter provided, a plat of which has been or will be recorded with the Recorder of Deeds in Woodbury County, Iowa, with privilege to exchange said lot before Sepulture for any other unsold lot of the same price and privilege at time of transfer, and to pay therefor the sum of Three hundred & no/100 Dollars ($300.00) as follows, to-wit One hundred & no/100 Dollars ($100.00 cash, the receipt whereof is hereby acknowledged, and Five Dollars ($5.00) on Sept. 20, 1951, and Five Dollars ($5.00) on the 20th day of each month thereafter, until the said entire purchase money is paid in accordance with the terms of installment note executed by Party of the Second Part.

"When the balance due hereunder is paid in full the Party of the First Part shall deliver to the Party of the Second Part a good and sufficient warranty deed conveying said lot for burial purposes only, subject to the rules and regulations of the Sioux City Memorial Park Cemetery.

"A permanent care, maintenance and improvement fund has been created by setting aside a minimum of 10 per cent of the gross amount received from all lots sold, with the Woodbury County Savings Bank, Trustee, under a trust agreement whereby the funds must be invested as required by the statutes of the State of Iowa and only the income used for perpetual care.

"This agreement is assignable only with the consent of seller, and burial privileges accrue only to members of the Caucasian race, and before any burial can be made the grave space or spaces so used shall be paid in full.

"It is further agreed that should any of the foregoing covenants remain unperformed by the said Party of the Second Part for a period of 90 days after the same should have been performed under this contract, then, in that event, the said Party of the First Part may re-enter upon the premises without notice and hold the same

as of former estate, and all the said payments made prior to such re-entry shall be considered as a credit to apply on a future purchase of another lot of the same size if purchased by Party of the Second Part within one year from the date of such re-entry, at the then prevailing prices and terms of payments.

"It is further agreed that time is of the essence of this agreement, and in the event of re-entry by Party of the First Part and failure of Party of the Second Part to purchase another lot within one year of date of such re-entry, then all payments made hereinunder shall become forfeited to Party of the First Part as liquidated damages.

"This contract is subject to the rules and regulations and by-laws of the Sioux City Memorial Park Cemetery, Inc. The party of the Second Part agrees to purchase any grave markers necessary from the Party of the First Part. Only bronze markers may be used in the said cemetery, and must be purchased from the Party of the First Part subject to its rules and regulations.

"No condition, regulation, or agreement other than those printed herein or contained in Sioux City Memorial Park Cemetery, Inc., rules and regulations shall be binding upon the seller, and this agreement shall not become effective until executed and approved by an executive officer of the Sioux City Memorial Park Cemetery, Inc.

"In Witness Whereof we have hereunto subscribed our names this 17 day of August, 1951.

"Sioux City Memorial Park Cemetery, Inc.

"/s/ Mrs. Evelyn Rice
Purchaser
"Address
"Winnebago, Nebr.
/s/ By J. Ben Willey
Sales Representative.
/s/ Approved J. M. Gunnell."

$200.00     Sioux City, Iowa, Aug. 17, 1951

"For Value Received, I promise to pay to order of Sioux City Memorial Park Cemetery, Inc., the sum of Two hundred & no/100 Dollars, at the office of Sioux City Memorial Park Cemetery, Inc., in Sioux City, Iowa, in installments as follows:

Five Dollars on the 20 day of September, 1951.

Five Dollars on the 20 day of each succeeding month thereafter, until the entire amount of $200.00 has been paid.

"/s/  Mrs. Evelyn Rice
Purchaser
"Address   Winnebago, Nebr."

### Exhibit "B"

"State of Nebraska⎫ SS.
"Thurston County ⎭

"Evelyn Rice being first duly sworn on oath depose and say: That I am the widow of John R. Rice a sergeant first class in the United States Army. That he was killed in action in Korea. That he was a member of the Caucasian race. Further affiant saith not.

"Subscribed and sworn to before me this 28th day of August, 1951.

"Notary Public in and for Thurston County, Nebraska

### Exhibit "C"

### The Truth About the Sgt. Rice Incident.

"In fairness to our Lot Owners and the citizens of Sioux City and vicinity, who are interested in the Memorial Park, we feel that the many false statements that have been published about this incident should be clarified by a frank statement of the truth:

"1.   Contrary to general belief and newspaper publicity, the Sioux City Memorial Park did *not solicit* the burial of Sgt. Rice.

"Mr. D. T. Boyd, the undertaker, of South Sioux City, Nebraska, called and made the appointment to meet Mr. Ben Willey, Sales Manager, at the Park, on August 17, 1951, after, as we were later informed, they had been turned down by two or three other cemeteries. Mr. Boyd, Mrs. Rice and her sister (Mrs. Rice and her sister are both white but married to Indian brothers) met Mr. Willey at the

Park, and Mrs. Rice purchased three spaces on an installment basis and arranged for the burial of Sgt. Rice. Nothing was said about Sgt. Rice being an Indian or that Mrs. Rice lived on the Indian Reservation when the lot was purchased, or prior to the funeral. On the 18th day of August a copy of the contract signed by Mrs. Rice was mailed to her containing the restriction limiting burial to members of the Caucasian Race. The funeral was not held until August 28th. Mrs. Rice had her copy of the contract for ten (10) days, which was ample time for her to inform herself of its contents and restrictions. Mr. Boyd knew, or should have known, about the restriction, as an undertaker of this community whose business is dealing with cemeteries, especially as we have been informed that the burial was turned down by two or three other cemeteries before coming to the Memorial Park. Contrary to publicity, the service by the Catholic priest at Memorial Park was not interrupted and the family had already left the grave-site when Mr. Willey asked the undertaker and was informed that the deceased was an Indian. The body was never lowered into the ground. The first notice that the Park had of the fact that the deceased might be an Indian was that practically all of the mourners at the funeral were Indians.

"2. The present Owners and Officers of the Park have no racial prejudice and were not responsible for the restriction to only members of the Caucasian Race.

"3. Every contract and deed since the cemetery was started carries this restriction.

"4. Dr. R. S. McNeish, of the National Museum at Ottawa, Canada, and other Canadian archaeologists have reported definite proof that American Indians are descended from Wild Mongolian Nomads that came to North America from Asia by way of Alaska. In other words, the American Indian is not of Caucasian descent, to the best of our available information.

"If the burial of Sgt. Rice had been permitted, every Lot Owner in the Park could have recourse against the corporation for damages for breach of contract. The offi-cers of the Park are legally bound to enforce and protect its contracts and contract holders—such proceedings could have financially wrecked the Park. Any removal of this restriction would have to be by agreement of all lot owners, which would be a practical impossibility.

"5. The officers of the Park have never at any time retracted from the position first taken, as they could not legally do so.

"6. The apology so publicized was simply an impression of regret that the officers were legally bound to take the position that they did.

"7. Contrary to reports in the press, the officers of the Park did not offer Mrs. Rice any lot in the Memorial Park. The City Council of Sioux City offered any lot in any Sioux City owned cemetery. Mrs. Rice had already contracted for space in Memorial Park which made such an offer on behalf of the Memorial Park unnecessary. As she could not legally use the space already contracted for, you can see that such an offer would be meaningless. We have had many inquiries as to why we did not publicly defend our position during the height of the publicity that was given to this incident. Our failure to do so was in deference to the request of many business men and citizens of Sioux City who wished to end the publicity as quickly as possible, and also to our knowledge of the fact that under this mob hysteria, any statements made by us, as had been demonstrated, would not be fairly reported.

"8. The restriction to members of the Caucasian Race is almost as old as the cemetery business and has come down with the development of the cemetery business. This restriction is in probably 90 per cent of the private cemeteries in the United States, including Forest Lawn in California and Graceland Park in Sioux City. Private cemeteries have always had a right to be operated for a particular group such as Jewish, Catholic, Lutheran, Negro, Chinese, etc., not because of any prejudice against any race, but because people, like animals, prefer to be with their own kind.

"9. It was only in 1947 that racial discrimination was removed from Arlington

Cemetery in Washington, D. C. (even privates could not be buried next to officers) and yet we understand that Sgt. Rice is one of the first known Indians to be buried there.

"10. We also are considerate of the welfare of the Indian—

"a. Why can't he vote?

"b. Why can't he buy a bottle of beer?

"c. Why are 60,000 Navajo and Hopi Indians living in indescribable squalor, with deaths from tuberculosis, pneumonia, dysentery and starvation tripling their death rate? Half of the children cannot go to school, for there are no schools.

"d. What about the thousands of other Indians who died in their country's service without recognition?

"e. Why the belated recognition? Any veteran of the United States Armed Services can be buried in Arlington without the President's consent, but it *is restricted to only members* of the *Armed Services.* Many statesmen and outstanding public servants who served their country too, would have preferred burial there, but could not because *it was restricted.*

"We submit the above for your fair and unbiased appraisal.

> "The Memorial Park
> "Sioux City, Iowa.